**Roland RIDDELL, Appellant,**

v.

**RIDDELL WASHINGTON CORPORATION, et al.**

No. 88–7017.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 27, 1988.

Decided Feb. 3, 1989.

Laurance J. Ochs, Washington, D.C., for appellant.

Calvin H. Cobb, Jr., Washington, D.C., for appellees.

Before MIKVA and D.H. GINSBURG, Circuit Judges, and ROSENN *, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Opinion concurring in part and dissenting in part filed by Senior Circuit Judge ROSENN.

D.H. GINSBURG, Circuit Judge:

This appeal involves an intra-familial dispute over the sale, in 1981, of substantial stock interests in two closely held corporations. The stock was sold for $106,936 pursuant to a foreclosure provision in a loan agreement between plaintiff Roland Riddell, as borrower, and his mother, defendant Jean Riddell, as lender. In 1987, the corporations sold their principal assets —two parcels of real estate—for approximately $13,000,000. Plaintiff now asserts that he was defrauded by other members of the family as to the value of his stock in 1981.

* Of the United States Court of Appeals for the Third Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a).

In his amended complaint against his mother, his sisters Sally Arthur, Joan Baer, and Marise Reynolds, his brother-in-law Robert Arthur, and the two corporations, plaintiff alleges: (1) that all defendants violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (1982 & Supps. 1984 & 1986) (RICO); (2) that all but the corporate defendants engaged in common law fraud, deceit, and conspiracy to defraud and to deceive; (3) that Jean Riddell violated Rule 10b–5, promulgated under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), (4) converted plaintiff's property, (5) violated the provision of the Uniform Commercial Code (UCC), D.C.Code § 28:9–504, that prescribes the terms under which a secured party may dispose of collateral, and (6) breached her loan agreement with plaintiffs; (7) that Jean Riddell, Robert Arthur, and Sally Arthur, the corporate officers, breached their fiduciary duty to plaintiff as a shareholder; and (8) that the corporate defendants wrongfully transferred plaintiff's shares in their stockholder records and (9) were obliged to replevy the shares. The district court granted defendants' motion for summary judgment and partial judgment on the pleadings on the ground that plaintiff's claims were barred by relevant statutes of limitations. *Riddell v. Riddell Washington Corp.*, 680 F.Supp. 4 (D.D.C.1987). The court found that plaintiff had sufficient knowledge of the underlying facts to put him on notice of his claims by 1983. The court did not address plaintiff's argument that defendants fraudulently concealed his causes of action from him. *Id.* at 8.

The district court apparently never ruled on the Securities Exchange Act and replevin claims; we are therefore required to remand the matter for the district court to pass upon those claims in the first instance. Otherwise, we affirm, except with regard to the RICO and common law fraud, deceit, conspiracy, and breach of fiduciary duty claims, where reversal is required because the entry of summary judgment was dependent upon an erroneous factual finding bearing on fraudulent concealment.

## I. PRELIMINARY ISSUES

As an initial matter, plaintiff raises a question as to which of the claims were properly before the district court when it granted defendants' dispositive motion. Defendants filed their motion for summary judgment on August 19, 1987. Plaintiff's opposition to the motion was filed on September 18. On October 6, however, the district court granted plaintiff leave to file an amended complaint, which added two new counts—the federal securities law claim against Jean Riddell, and the replevin claim against the corporate defendants. The amended complaint also alleged, in great detail, new facts discovered under the original complaint and supportive of the counts that were merely carried over from the original to the amended complaint. Nonetheless, defendants did not supplement their motion for summary judgment in response to the amended complaint.

In ruling on the motion, the district court stated:

Obviously, the defendants' motion for summary judgment addressed the claims as they appeared in the original complaint. In fact, plaintiff ... filed his opposition on September 18, 1987 addressing the issues as drawn in the original complaint. The amended complaint elaborates on the nature of the claims, includes other defendants into [sic] claims stated in the original complaint and adds two counts ... alleging fraud in the sale of securities in violation of the Securities Exchange Act [and] replevin.... The Court did grant leave to file an amended complaint; yet *the Court is concerned that the summary judgment memoranda addressed the issues as drawn in the original complaint. The Court determines that the outcome of the statute of limitations issues would be the same under the original complaint, as well as the amended complaint. Because the summary judgment motion was drawn in keeping with the original complaint, the Court*

*shall address the issues in accordance with the original complaint.*

680 F.Supp. at 5 n. 1 (emphasis added).

The district court's opinion separately addresses each of the seven counts of the original complaint. Apparently because the district court thus approached the issues as framed in the original complaint, its opinion does not specifically address the two counts added by the amended complaint. As emphasized above, however, it does conclude generally that "the outcome of the statute of limitations issues would be the same under the original complaint, as well as the amended complaint." *Id.* At oral argument, defendants' counsel suggested that this conclusion be read to encompass the additional counts.

The quoted passage is ambiguous. On the one hand, as defendants' counsel urged, it could be read as saying that the statute of limitations issues implicated by the two new counts are the same as those raised by the counts in the original complaint. Under this reading, the court ruled not only on the carryover counts, but also on the counts added in the amended complaint. This reading would not necessarily render the ruling improper, notwithstanding that the added counts were not the subject of defendants' motion; for, as we have previously suggested, where a district court concludes that no reasonable jury could find for the plaintiff it may, on its own initiative and after proper notice, grant summary judgment in favor of the defendant. *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.,* 838 F.2d 1287, 1292 (D.C.Cir.1988).

An equally plausible and we think preferable reading, however, would be simply that the statute of limitations issues under the counts that were carried forward from the original complaint were not materially altered by the new facts alleged in the amended complaint. This reading is both fairer to the plaintiff and more in keeping with the assumption that the district court proceeded methodically. First, the district court's opinion discusses the seven original counts one by one, yet it contains no specific discussion of either of the two new counts. Second, the opinion was expressly addressed to the original complaint. In these circumstances, it is more reasonable to infer that the district court's ruling on the motion for summary judgment does not encompass the counts added in the amended complaint. Rather, it appears that the district court, having put the amended complaint to one side in order to address the motion for summary judgment, then simply failed to return to it with an eye to disposing of the added counts.

Because we hold that both new counts survived the district court's disposition of defendants' motion, we do not address those counts here, but rather remand in order that the district court may address them in the first instance.

## II. STANDARD OF REVIEW

The basic issues on this appeal are whether the defendants committed acts of concealment that tolled the statutes of limitations on plaintiff's claims, and whether, even if such acts of concealment did take place, plaintiff was nonetheless aware of facts sufficient to put him on notice of his claims. In general, the determination of whether a defendant has committed an act of concealment, where it turns on questions of fact, is a matter for the jury. *Hobson v. Wilson,* 556 F.Supp. 1157, 1174 (D.D.C. 1982), *aff'd in relevant part,* 737 F.2d 1, 37 (D.C.Cir.1984). Similarly, what a plaintiff knew and when he knew it, in the context of a statute of limitations defense, are questions of fact for the jury. *See, e.g., Timmel v. Moss,* 803 F.2d 519, 521–22 (9th Cir.1986); *Dawson v. Eli Lilly & Co.,* 543 F.Supp. 1330, 1339 (D.D.C.1982).

The Supreme Court recently stated the standard for granting summary judgment, and thus taking such issues away from the jury, as follows:

> If the defendant in a run-of-the-mill civil case moves for summary judgment ... based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fairminded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scin-

tilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). On appeal from an order granting summary judgment, this court reviews the record *de novo* to determine whether, under the standard just quoted, it supports that order. *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 598 (D.C.Cir.1988). Thus we must determine, based on the record that was before the district court, whether a jury could reasonably have found that plaintiff's claims are not time-barred. With that question in mind, as we recount the facts underlying this dispute, we resolve all well-supported conflicts of evidence in plaintiff's favor.

### III. BACKGROUND

Prior to January 1979, plaintiff was a substantial stockholder in two family-owned corporations. The principal assets of the two corporations were parcels of real estate, which were encumbered by 99–year ground leases, and on which were situated office buildings. One of the parcels relevant to this dispute, located at 1730 K Street, N.W., Washington, D.C., was owned by Riddell Washington Corporation (RWC). The other parcel, located at 1776 K Street, N.W., was owned by Riddell Properties, Inc. (RPI).

The RWC lease, executed in 1959, provided for an annual rental of $40,000 to be renegotiated as of June 30, 1981 and every ten years thereafter to 5% of the appraised value of the land. The RPI lease, executed in 1967, provided for an annual rental of $36,000, subject to a similar provision for renegotiation in 1992.

At all relevant times, Jean Riddell held all of the voting common stock (1.96% of the equity) of RWC and all of the voting common plus approximately one half of the non-voting common (totalling 54.96% of the equity) of RPI. Prior to the sale of plaintiff's shares, the remainder of the equity

(non-voting common) in each corporation was divided in equal shares among plaintiff and his three sisters. Thus, plaintiff's shares in the equity of RWC and RPI were approximately 25% and 11%, respectively. Jean Riddell, Robert Arthur, and Sally Arthur were officers and directors of each of the corporations.

In 1978, plaintiff was experiencing financial difficulties in connection with a home mortgage brokerage business of which he was president. He sought a bank loan of $150,000, offering as security his stock holdings in RWC and RPI. In order to support his representation that the stock was worth at least $150,000, plaintiff secured an appraisal of the long-term leases on the K Street properties (the Donnelly Appraisal).

The Donnelly Appraisal presented plaintiff with certain information relevant to the present statute of limitations issues. First, the Donnelly Appraisal noted the terms of the leases and the years in which they were to be renegotiated. Second, it estimated that the 1981 renegotiation of the RWC lease would result in an increase in the annual rental to $133,875 from $40,000 and that the 1992 renegotiation of the RPI lease would produce an increase to $86,700 from $36,000.

Nonetheless, the bank declined to make the loan because it was concerned that a minority interest in a family-owned corporation would not be marketable. The bank suggested, however, that it would accept the stock as security if the corporations agreed to buy back the stock in the event of default. Plaintiff called a meeting of the shareholders of the corporations and proposed the buy-back arrangement. There is some dispute about what was said at this meeting. The upshot, however, was that plaintiff's mother instead agreed to lend plaintiff the money herself.

The resulting loan agreement, dated January 3, 1979, provided that the loan was to be repaid in 90 days with an annual interest rate of 13%. As security for the timely payment of the note, plaintiff pledged all of his stock in both RWC and RPI, together with his shares in related family corpora-

tions, and all dividends associated with the stock. The agreement expressly gave Mrs. Riddell "authority to sell, transfer, [and] rehypothecate said collateral." The agreement further provided that in the event of default:

> holder may apply all collateral received towards the balance due and full power and authority are hereby given to the holder to sell, assign, and deliver the whole of the above mentioned collateral, or any part thereof, [at] a public or private sale, [at] the option of the holder, without demand, advertisement or notice, and to collect the proceeds thereof, and after deducting all legal and other costs and expenses of collection, sale and delivery, to apply the residue of the proceeds to the payment of any and all liabilities hereunder.

In the event of such a sale, "[a]ny surplus [was] to be returned to [Roland Riddell] with a full and accurate accounting."

In addition to authorizing Jean Riddell to apply the proceeds of a sale of the stock toward the underlying debt, the agreement stated that in the event of default, plaintiff's three sisters would receive a 30-day option to "redeem the pledged collateral by paying the principal and all interest due to holder, thus relieving [plaintiff] of all further liability to holder."

As of January 1979, plaintiff's stock was placed in Jean Riddell's name and, pursuant to the terms of the loan agreement, all dividends were sent to her. Plaintiff failed to repay the loan when it came due in April 1979.

The next events relevant to this dispute occurred in 1981. First, as noted above, the lease on the property at 1730 K Street became subject to renegotiation, by its terms, as of June 30, 1981. Accordingly, on April 15, 1981, the rental was increased not threefold, as Donnelly had predicted in 1979, but more than sixfold, to $258,000 from $40,000. Plaintiff asserts that he did not learn the actual amount of the new rental until after he filed this lawsuit in 1987. Joint Appendix (J.A.) at 368–69.

Second, on May 5, 1981, Robert Arthur suggested to Jean Riddell, in a letter, that she foreclose on plaintiff's $150,000 note. J.A. 228. Two days later, Arthur made a formal offer to Mrs. Riddell, on behalf of the corporations, to purchase plaintiff's stock from her. J.A. 229. Later in the month, Arthur sent letters to plaintiff's sisters informing them of their options to purchase the stock. J.A. 230–31, 234–36. They did not exercise their options, however, and at a meeting of the boards of directors on November 22, 1981, the directors voted unanimously to cause the corporations to purchase the shares from Jean Riddell for "the appraised figure" for their value. Plaintiff's Exhibit 15 at 2–3; J.A. 426. This transaction was effected on December 28, 1981, at a price of $106,936. J.A. 243.

There is evidence in the record from which a jury could reasonably piece together the following scenario with respect to these 1981 transactions. The renegotiation of the RWC lease in 1981 dramatically increased the value of the stock. J.A. 127. What had been an investment of very modest value suddenly became a source of substantial dividends, and increased in value concomitantly. At some point, either during negotiations over the lease or just after the new rental agreement was reached, Jean Riddell or Robert Arthur raised the question whether plaintiff or his creditors would have any claim on RWC's future income stream with respect to the RWC shares that Jean Riddell held as collateral for the 1979 loan. J.A. 228, 249, 452; deposition of Jean M. Riddell at 18–19, 94. Robert Arthur encouraged Jean Riddell to foreclose in order to avoid any such complication. Deposition of Jean M. Riddell at 18–19. Mrs. Riddell was reluctant to foreclose her son, *id.* at 78, 86–87, 92–93, but Arthur pressed the matter. J.A. 232. At the same time, he advised plaintiff's sisters of their right to exercise their options to purchase the stock by paying off the loan. J.A. 234, 244; deposition of Jean M. Riddell at 85–86. Jean Riddell did then foreclose on plaintiff's defaulted loan and sell the shares to herself in a private sale for the then outstanding balance of the loan. J.A. 200–02, 249; deposition of Jean M. Riddell at 92–93.

Plaintiff was aware of none of these events at the time.

On May 11, 1981, Robert Arthur telephoned plaintiff, who questioned him as to the balance due on the loan once the dividend payments going to his mother were credited against the unpaid interest. J.A. 321, 322–23, 323–34; 360. Plaintiff also told Arthur that he believed the stock to be worth more than the $150,000 principal amount of the underlying loan, J.A. 324, 360, but Arthur disagreed with that assessment. J.A. 360.

In the meantime, discussions continued, without plaintiff's knowledge, regarding the appropriate disposition of the stock he had pledged. J.A. 420. On September 20, 1981, the boards of directors of the corporations, which as of that date were expanded to include Joan Baer and Marise Reynolds, determined to secure an independent appraisal of the shares. The minutes of the board meeting state as to this decision:

Mr. A[r]thur moved that an appraisal be undertaken by the accountants for a determination of the stock value of the defaulted stock Mrs. Riddell now owned after the foreclosure of the Roland Riddell loan. Mr. Arthur explained that the corporation could not offer for the stock without an independent valuation.... A vote was taken, Mrs. Riddell abstained and the vote was passed, by a majority present.

J.A. 420. Since defendants were aware that plaintiff might challenge the transaction, J.A. 128; deposition of Jean M. Riddell at 146–47, they contemplated that the independent appraisal would be shared with him. J.A. 210.

On September 25, 1981, Robert Arthur wrote to the corporations' accountants, Buchanan & Co., to ask how he could "arrive at a value for the corporations to pay for their own stock." J.A. 425. Arthur's letter stated:

I would prefer to avoid a "full blown" audit of corporations [sic], if possible. Could you do a present value of the cash flow and estimate of properties—accounting for expenses, etc. and multiplying by the percentage of ownership—closely held, etc. ownership? Tell me what you need to do the valuation, please. The purpose is so the corporations can purchase from Jean Riddell the shares she has obtained from a defaulted loan with Roland Riddell. I would like you to do this if you can, before November 1. Is it possible and what do you need?

*Id.* Apparently after hearing from Buchanan & Co., Robert Arthur sent a second letter providing information about the assets of the corporations, including the two leases. J.A. 422–24. This letter purported to request "an opinion of value for an 'arms's [sic] length purchaser' to use to determine how much to pay for shares of stock." J.A. 422.

There is evidence from which a jury could reasonably conclude that plaintiff's stock was not, in fact, independently appraised. First, although Robert Arthur's letter purported to request an "arm's length" opinion of value, it instructed Buchanan & Co. to deduct ("if appropriate") "a substantial factor for discount (35% to 50%) as to the nature of the securities being purchased," apparently because the stock was not readily marketable. J.A. 424. Buchanan & Co. produced worksheets reaching several different valuation figures for the stock of each of the corporations (Buchanan Appraisal I). J.A. 238–42, 363–66, 436–41. With respect to RWC, Buchanan & Co. calculated: (1) asset value of $2,507,000, which it discounted per Robert Arthur's instructions to $1,205,533; (2) after-tax capitalized earnings of $800,000, *not* taking into account the renegotiated rents; (3) after-tax cash flow of $870,000; and (4) book value of $158,000. As for RPI, Buchanan & Co. calculated: (1) asset value of $623,708, which it discounted by 50% to $312,000; and (2) capitalized earnings of $260,000, discounted by 50% to $130,000. J.A. 238. Buchanan Appraisal I did not assign weights to the various values in order to reach a single valuation figure for the corporations or for plaintiff's equity interest in them.

It is undisputed that one week later Robert Arthur, not Buchanan & Co., deter-

mined the final valuation figure ($106,936) for plaintiff's equity interest. J.A. 237, 413. With respect to RWC, Arthur first simply averaged the four values produced by Buchanan & Co. (thus giving equal weight to the book value, which a Buchanan & Co. witness testified he would not have considered at all for purposes of valuing the stock of the corporations (deposition of Ronald Dungan at 40–42)), and arrived at a "mean value" of $758,250. He then multiplied that figure by 25% (plaintiff's share of the stock), yielding $189,562. Finally, despite a concern he had expressed one week earlier that plaintiff "might step in and say—I don't agree with your discount," J.A. 128, Arthur took an *additional* discount of 50% over and above the discount he had instructed Buchanan & Co. to take, thus arriving at a figure of $94,781. When asked at deposition why he discounted the value of the stock by 50% a second time, Robert Arthur said only, "Why not?"

As for RPI, Arthur again averaged the two Buchanan figures, multiplied by plaintiff's 11% share, and applied a 50% discount—again, over and above the discount applied by Buchanan & Co.—to reach a value of $12,155. Thus was reached the total figure of $106,936 that was ultimately paid for plaintiff's shares in the two corporations. J.A. 237, 243. At some subsequent point these calculations and the final figure Arthur reached by them were reprinted, by Arthur or by another, on Buchanan & Co. letterhead (Buchanan Appraisal II), according to plaintiff; and we agree at least that a jury could reasonably so infer.

According to plaintiff, it was not until the "spring or the late winter of [19]83" that he learned any of the details of the 1981 transactions. J.A. 315. It was then that his mother first informed him that she had foreclosed on his loan and sold the stock to the corporations in 1981; when she told him the price at which she had sold it, he was shocked. J.A. 280, 315–16. She showed him one or two pages of Buchanan Appraisal II, consisting of Robert Arthur's figures on Buchanan & Co. stationery, J.A. 281, 315, 329, 336, 337, and assured plaintiff that Buchanan & Co. had performed

the appraisal. J.A. 213–14. Plaintiff testified at his deposition:

It's that time that I saw an appraisal, and I remember just being shocked at what the value was and yet it looked like a bona fide appraisal.

\* \* \* \* \* \*

In 1983, I thought it was worth more until I had been presented with this appraisal and told that's all it was worth.

\* \* \* \* \* \*

I questioned the value of the stock, but Mother said it had been appraised. Mother told me repeatedly it's been appraised and we've been assured that's the value.

J.A. 315, 329, 335.

Plaintiff later raised with Marise Reynolds the issue of the price paid for his stock in 1981. J.A. 96–97. According to her deposition testimony, she also assured him that his stock had been appraised by Buchanan & Co. Deposition of Marise Reynolds at 49–50, 54.

The district court found that the appraisal that plaintiff saw in 1983 "set forth a range of values for the stock." 680 F.Supp. at 9. This finding suggests that the court understood plaintiff to have been shown Buchanan Appraisal I, which included the underlying worksheets produced by Buchanan & Co., since those worksheets are the only documents in the record that contain the "range" arrived at by Buchanan & Co. If plaintiff had in fact seen Buchanan Appraisal I, he might have realized that Buchanan & Co. had discounted the value of his shares by 50% in its initial calculations and that a second 50% discount was subsequently taken in arriving at the final figure. This might well have constituted notice of a possible fraud.

In fact, however, plaintiff testified, and defendants did not dispute for purposes of their motion, that he was not shown the underlying Buchanan & Co. worksheets containing the "range of values" but rather saw only Buchanan Appraisal II, which consisted only of Robert Arthur's calculation of the "bottom line," printed on Bu-

chanan & Co. stationery. J.A. 194–96, 203, 335–37, 369–70. The district court's factual finding to the contrary is therefore erroneous. Based upon a correct understanding of the record, a jury could reasonably find that plaintiff did not learn until after he began this litigation in 1987 that Robert Arthur, an interested party, not the independent Buchanan & Co., had produced the final figure of $106,936.

A jury could also find that when Jean Riddell showed plaintiff Buchanan Appraisal II and assured him that it was *bona fide*, she knew that the final figure of $106,936 had been calculated by Robert Arthur rather than by Buchanan & Co.; her deposition testimony so states. Deposition of Jean M. Riddell at 104, 106–09, 122, 135–36. Similarly, Marise Reynolds was aware, when she assured plaintiff that the appraisal had been performed by Buchanan & Co., that Robert Arthur had calculated the figure that was paid for plaintiff's shares, as she acknowledged in her deposition testimony. Deposition of Marise Reynolds at 17–18. In addition, as set forth above, there is evidence from which the jury could reasonably infer that Robert Arthur, since he anticipated that plaintiff might challenge the deeply discounted value at which Jean Riddell would sell the stock to the corporations, J.A. 128, knew that plaintiff might be shown Buchanan Appraisal II in support of the price the corporations paid for the stock. Finally, the jury could reasonably find that all of the members of the boards of directors of the corporations who, at the September 20, 1981 board meeting, voted to secure an "independent valuation" (1) had become aware by the November 22 board meeting that Robert Arthur had produced "the appraised figure" set forth in Buchanan Appraisal II; and (2) nonetheless voted at that meeting to approve the sale at that price. J.A. 420; deposition of Robert G. Arthur at 114, 126; deposition of Marise Reynolds at 17–18, 21–22; deposition of Joan Baer at 13, 16–17, 21, 45, 47–48, 50–51; deposition of Sara Arthur at 13, 54; plaintiff's Exhibit 15 at 2–3.

## IV. FRAUD AND RICO CLAIMS

In his amended complaint, plaintiff alleges that all defendants violated RICO. The statute of limitations for RICO liability is four years. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, ——, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). Plaintiff also alleges that all the non-corporate defendants engaged in fraud, deceit, conspiracy to defraud, and conspiracy to deceive. The District of Columbia three-year statute of limitations applies to all of these state law claims. *Hoffa v. Fitzsimmons*, 673 F.2d 1345, 1360 n. 41 (D.C.Cir.1982) (District of Columbia statute of limitations applies in diversity cases); *King v. Kitchen Magic, Inc.*, 391 A.2d 1184, 1186 (D.C.1978) (statute of limitations for claims sounding in fraud is three years).

Plaintiff filed this action on April 6, 1987, which is the relevant date, under federal and District of Columbia law, for determining its timeliness. Fed.R.Civ.P. 3; *West v. Conrail*, 481 U.S. 35, 39, 107 S.Ct. 1538, 1541, 95 L.Ed.2d 32 (1987); *Varela v. Hi-Lo Powered Stirrups, Inc.*, 424 A.2d 61 (D.C.1980). There can be no dispute that the time at which plaintiff's RICO, fraud, deceit, and conspiracy claims *accrued*— that is, the earliest time at which plaintiff could have maintained an action on the merits—was in 1981 when the relevant transactions occurred. If the statute of limitations began to run in 1981, each of those claims would be time-barred.

For claims sounding in fraud, however, the District of Columbia statute of limitations does not begin to run until the plaintiff "ascertains, or with the exercise of due diligence should ascertain, the material facts upon which the claim is based." *Hartford Life Insurance Co. v. Title Guarantee Co.*, 520 F.2d 1170, 1174 (D.C. Cir.1975). Several of the federal circuits have applied a similar "discovery rule" to RICO claims. *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102–05 (2d Cir. 1988); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 220 (4th Cir.1987); *La Porte Construction Co., Inc. v. Bayshore National Bank*, 805 F.2d 1254, 1256 (5th Cir.1986); *Alexander v. Perkin Elmer Corp.*, 729 F.2d 576, 577

(8th Cir.1984); *Compton v. Ide*, 732 F.2d 1429, 1433 (9th Cir.1984); *Bowling v. Founders Title Co.*, 773 F.2d 1175, 1178 (11th Cir.1985). Assuming this rule applies, the questions properly before the district court on the fraud, deceit, conspiracy, and RICO counts were (1) whether a jury could reasonably find that plaintiff never had sufficient knowledge of the facts to set the statutes of limitations for his respective causes of action running in the first instance; if it could not so find, (2) whether it could reasonably conclude that those statutes of limitations were tolled, either from the outset or at some subsequent point, by affirmative acts of fraudulent concealment by the defendants; and, if the jury could reasonably conclude that the statutes were so tolled, (3) whether the jury would nonetheless be compelled to conclude that defendants met their burden of showing that plaintiff was on notice of his claims under the standard for notice that is applicable once fraudulent concealment is shown.

The district court answered the first question in the negative, concluding that plaintiff, by March of 1983, had sufficient knowledge of the facts underlying his fraud, deceit, conspiracy, and RICO claims to set the statute of limitations running on those claims.

Specifically, the court: (1) found that plaintiff, in 1978, secured the Donnelly Appraisal "which valued the properties underlying the stock at $1,854,000," 680 F.Supp. at 9; (2) noted that plaintiff did not refute Sally Arthur's testimony that she advised him in 1979 of the upcoming lease renegotiation and that it would increase dividends;[1] (3) found—erroneously, as set forth above —that plaintiff saw, in 1983, a Buchanan & Co. appraisal that "set out various values for the stock," *id.;* (4) found that plaintiff admitted knowing in the late winter of 1982 or the early spring of 1983 that his loan had been foreclosed and that the underlying stock had been sold to the corporations; and (5) found that plaintiff believed that the price for which the corporations purchased the stock was too low and voiced

this complaint to some of the defendants. *Id.* The court concluded:

> If plaintiff was unhappy in 1983 with the valuation of the stock and the sale price of the stock he could have requested his own appraisal, as he had done in 1978, or requested corporate financial statements, a course of action plaintiff admits he did not pursue. Moreover, plaintiff's assertion that he could rely on his mother, who was president of the corporations, and her statements of the values and financial condition of the company [sic] does not excuse plaintiff from exercising due diligence once the storm clouds gathered indicating that potential fraud existed.

*Id.* (record citation omitted).

Finally, the court held as a matter of law that a reasonable business person with plaintiff's general knowledge of the real estate market and the specific facts that plaintiff knew in 1983 would have investigated his suspicion that the stock was undervalued. Thus, the court held that as of March 1983 plaintiff had a duty to investigate possible fraud, and that as a result the statute of limitations began to run at that time.

■ Based on its conclusion that the statute of limitations began to run on plaintiff's claims by 1983, the district court declined to reach plaintiff's allegations of fraudulent concealment. The court reasoned:

> In this jurisdiction, the Court does not address a claim of fraudulent concealment if the Court finds that the plaintiff was on notice of the wrongs of which he complains.

680 F.Supp. at 8. In support of that proposition, the court cited *Bender v. Rocky Mountain Drilling Associates*, 648 F.Supp. 330, 330 (D.D.C.1986), which in turn relied upon our decision in *Hobson v. Wilson*, 737 F.2d 1, 35 (D.C.Cir.1984). The district court then concluded that plaintiff was on notice of his claims, but in doing so looked to cases in which fraudulent concealment either was not shown or was not

---

1. Plaintiff correctly asserts that this is a disputed fact. He concedes, however, that this fact is "irrelevant to the statute of limitations issue before the court."

alleged. *E.g., Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 131 (1st Cir.1987).

The district court's determination not to reach the issue of fraudulent concealment proceeds from an erroneous reading of our precedent. We held in *Hobson* that while mere inquiry notice may be sufficient to set the statute of limitations running in the absence of fraudulent concealment, when plaintiff shows that defendants committed affirmative acts of concealment with respect to a potential claim, defendants must meet a more stringent standard to bar a plaintiff on the ground that he was on notice of his claim notwithstanding the defendants' attempt to conceal it. *Hobson*, 737 F.2d at 35. Specifically, a defendant who has engaged in fraudulent concealment, in order to make out a defense based on the plaintiff's lack of due diligence, must show something closer to actual notice than the merest inquiry notice that would be sufficient to set the statute of limitations running in a situation untainted by fraudulent concealment. The fraudulent concealment by its nature makes discovery of the true facts more difficult, in part because it obscures the significance of such information as comes to plaintiff's attention. Furthermore, the concealing defendant lacks the equity to command easier access to the defense, especially in view of the inherent evidentiary difficulty of determining whether particular but isolated facts should have put the plaintiff on inquiry notice of his claim.

In light of our holding below that a jury could reasonably find that at least some of the defendants actively concealed plaintiff's RICO and common law fraud, deceit, and conspiracy claims from him, we need not reach either the issue of whether the "discovery rule" applies to RICO claims, or the question whether the facts as found by the district court—putting aside the erroneous finding that plaintiff saw Buchanan Appraisal I—would have been sufficient to put plaintiff on notice of his claim under the less rigid "discovery rule" standard.

A. *Fraudulent Concealment*

■ Both federal law and the law of the District of Columbia recognize that fraudu-

lent concealment tolls the running of a statute of limitations. *Hobson*, 737 F.2d at 33. *See also Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946) (fraudulent concealment is an "equitable doctrine [that] is read into every federal statute of limitations"). The elements of fraudulent concealment are the same, moreover (at least insofar as relevant to the facts of this case), in both federal and District of Columbia law. *Hobson*, 737 F.2d at 33 n. 101, 37 n. 113. As a result, the analysis of plaintiff's claims under RICO and for common law fraud, deceit, and conspiracy all turn on the same considerations inasmuch as the underlying allegations supporting those claims are directed at the manner in which defendants determined the price paid for plaintiff's shares.

■ In *Hobson*, we distinguished between wrongs as to which "concealment is established by the nature of the act," and wrongs as to which "additional acts of concealment are required to trigger the tolling requirement." *Hobson*, 737 F.2d at 33. In the latter type of case, "defendants must engage in some misleading, deceptive or otherwise contrived action or scheme, in the course of committing the wrong, that is designed to mask the existence of a cause of action." *Id.* at 34. Such deception "may be as simple as a single lie." *Id.* at 34–35. *See also William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1191–92 (D.C.1980) ("[Defendant] must have done something of an affirmative nature designed to prevent discovery of the cause of action.... [A]ny statement, word or act which tends to suppress the truth raises the suppression to that level"). Under either approach, if the jury finds fraudulent concealment, defendants will have the burden, if the statute is not to be tolled, of proving that plaintiff "could have discovered ... the cause of action if he had exercised due diligence." *Hobson*, 737 F.2d at 35 (quoting *Richards v. Mileski*, 662 F.2d 65, 71 (D.C.Cir.1981)); *see also id.* at 37 n. 113 (applying District of Columbia law).

■ On the facts reviewed above, plaintiff has adduced sufficient evidence to go to the jury on both the self-concealing and the subsequently concealed theories of fraudulent concealment. As to Robert Arthur, his instruction to Buchanan & Co. to discount their appraisal by a specified percentage and his later multiplicative discounting of the average of values produced by Buchanan & Co., combined with his expressed expectation that plaintiff might well challenge the resulting valuation (that is, the figure produced by Arthur's further discount), constituted sufficient evidence for a jury to conclude that Arthur defrauded plaintiff as to the existence of his cause of action. As to Jean Riddell, a jury could reasonably conclude that her presentation of Buchanan Appraisal II to plaintiff and her representation to him that the appraisal had been performed independently constituted an affirmative misrepresentation. Similarly, as to Marise Reynolds, her representation to plaintiff that his stock had been independently appraised, when she knew that it had not, could reasonably be found to constitute an affirmative misrepresentation.

Under the first test of *Hobson*, a jury could reasonably find that misrepresentations by Robert Arthur, Jean Riddell, and Marise Reynolds with respect to Buchanan II were part and parcel of the underlying fraud alleged, thus rendering the fraud self-concealing. Even if the jury finds that there was no self-concealing fraud, however, it could still reasonably find that affirmative misrepresentations by any of these three defendants constituted "additional acts of concealment" and thus tolled the statute of limitations. *Hobson*, 737 F.2d at 33.

As to the corporations, we have already seen that there is evidence that all of the directors of the corporations who had voted to secure an "independent" appraisal were aware that Robert Arthur had produced "the appraised figure," but nonetheless voted to approve the sale at that price. Thus, a jury could reasonably conclude that Robert Arthur was exercising his authority —either previously delegated or then ratified—as an agent of the corporations when he produced the figures contained in Buchanan Appraisal II, and that as a result, his actions tolled the statute of limitations as to the corporations. *See Buxton v. Diversified Resources Corp.*, 634 F.2d 1313, 1315–18 (10th Cir.1980) (scope of delegated authority); *Miller Tabak Hirsch & Co. v. Penn Traffic Co.*, 643 F.Supp. 1297, 1304–06 (W.D.Pa.1986) (retroactive ratification).

In an effort to quarantine the evidence concerning Buchanan Appraisal II, defendants raise what is essentially a materiality argument. They assert, and our dissenting colleague agrees, that because plaintiff's stock had already been sold to his mother at the time Buchanan Appraisal II was performed, "nothing relating to that document could be deemed to constitute a fraud upon him." On this theory, the only transaction in which plaintiff could have had any interest was the private sale in which his mother foreclosed on the loan and took the stock herself.

The difficulty with this argument is that there is evidence from which a jury could reasonably conclude that at least some of the defendants intended that plaintiff be lulled by Buchanan Appraisal II into accepting as reasonable the amount that Jean Riddell paid (*i.e.*, accepted in full satisfaction of plaintiff's debt) for the stock in the initial sale—a sale in which he had a stake because, if the stock was worth more than the amount owing on his debt to her, he was entitled to the excess under the terms of the loan agreement. Indeed, there is evidence that it was only when plaintiff complained that he had not received anything back after the final disposition of his stock that he was shown Buchanan Appraisal II and told that his stock had been appraised by Buchanan & Co. A jury could reasonably find that plaintiff's belief that the stock had been independently appraised prevented him from challenging either the initial sale to his mother or her subsequent sale to the corporation.

■ A question is nonetheless raised as to the responsibility of some of the defendants for such acts of other defendants as may amount to fraudulent concealment.

There is no evidence that either Sally Arthur or Joan Baer ever told plaintiff that his stock had been independently appraised or made any other affirmative misrepresentation that could amount to fraudulent concealment. In addition to alleging the underlying wrongs of fraud and deceit, however, plaintiff also alleged that all of the individual defendants were engaged in a conspiracy to defraud and deceive him. Thus, we must determine whether fraudulent concealment by Robert Arthur, Jean Riddell, or Marise Reynolds can be imputed to the other alleged co-conspirators.

In *Hobson,* defendants challenged one of the jury instructions on the ground that it conflicted with the " 'principle' that concealment by a third party may not be attributed to the named defendants." 737 F.2d at 41. *See, e.g., Wood v. Williams,* 142 Ill. 269, 31 N.E. 681, 683 (1892); *Joseph v. Lesnevich,* 56 N.J.Super. 340, 153 A.2d 349, 358 (1959). This court held that, assuming the stated principle to be the law, the instruction was nonetheless proper because it "generally required that concealment be attributable to the defendant or, with the conspiracy claims, to the overall conspiracy." *Hobson,* 737 F.2d at 42. Thus the court implicitly, but necessarily, held that where an act of concealment is attributable to the conspiracy itself, it can also be imputed to each of the co-conspirators. The few decided cases in which other courts have addressed this question similarly hold that, at least where the original conspiracy contemplates concealment, or where the concealment is in furtherance of that conspiracy, affirmative acts of concealment by one or more of the conspirators can be imputed to their co-conspirators for purposes of tolling the statute of limitations. *State of New York v. Hendrickson Brothers, Inc.,* 840 F.2d 1065, 1085 (2d Cir.1988); *Parish v. Maryland & Virginia Milk Producers Ass'n,* 250 Md. 24, 242 A.2d 512, 539, 551–52 (1968); *Johnson v. McMurray,* 461 So.2d 775, 777 n. 2 (Ala. 1984); *Chicago Park District v. Kenroy, Inc.,* 78 Ill.2d 555, 37 Ill.Dec. 291, 295–96, 402 N.E.2d 181, 185–86 (1980); *Holman v. Moore,* 259 Mich. 63, 242 N.W. 839, 841 (1932); *Ramey v. General Petroleum Corp.,* 173 Cal.App.2d 386, 343 P.2d 787, 794 (Dist.Ct.App.1959); *Bankers Commercial Life Ins. Co. v. Scott,* 631 S.W.2d 228, 233 (Ct.App.Tex.1982). *See also Jim Walter Homes, Inc. v. Waldrop,* 448 So.2d 301 (Ala.1983) (imputing misrepresentations where agency relationship alleged); *Martin v. Barbour,* 558 S.W.2d 200, 209 (Mo. Ct.App.1977) (same in the context of a partnership). *Cf. Colley v. Canal Bank & Trust Co.,* 159 F.2d 153, 154 (5th Cir.1947) (no imputed concealment where no collusive or joint activity shown); *International Union, United Automobile Workers v. Wood,* 337 Mich. 8, 59 N.W.2d 60, 62–63 (1953) (same where no conspiracy alleged); *Greenfield v. Kanwit,* 87 F.R.D. 129, 132 (S.D.N.Y.1980) (same where evidence failed to show that concealment was in furtherance of the original conspiracy); *Joseph v. Lesnevich,* 153 A.2d at 358 (same where defendants were not in privity and did not participate in concealment). We therefore hold that if the alleged conspiracy contemplated that plaintiff would be shown Buchanan Appraisal II in the event that he challenged the transaction, or if the representations that the appraisal was independently performed were in furtherance of that alleged conspiracy, then the acts of Robert Arthur, Marise Reynolds, and Jean Riddell may be imputed to Sally Arthur and Joan Baer for the purpose of tolling the statute of limitations.

▪ The question remains whether the same analysis applies to the underlying fraud, deceit, and RICO claims. Under both federal and District of Columbia law, civil conspiracy is not actionable in and of itself. *Zabriskie v. Lewis,* 507 F.2d 546, 553–54 (10th Cir.1974) (federal law); *Halberstam v. Welch,* 705 F.2d 472, 477, 479 (D.C.Cir.1983) (District of Columbia law). Rather, its purpose is to serve as a device through which vicarious liability for the underlying wrong may be imposed upon all who are a party to it, where the requisite agreement exists among them. *Weiss v. Gibson,* 610 F.Supp. 609, 611 (D.D.C.1985) (federal law); *Halberstam,* 705 F.2d at 479 (District of Columbia law). In order for that purpose to be served, in a case where

an act of concealment was either contemplated by or carried out in furtherance of a civil conspiracy, the statute of limitations as to the underlying wrong must be tolled. For without the support of the underlying wrongs, the conspiracy counts would collapse; as a matter of substantive law, one cannot be liable for a conspiracy that does not have as its object an actionable wrong. We do not believe that either federal or local law contemplates such a perverse result. Since we have already held that one conspirator's act of fraudulent concealment, if within the scope of the conspiracy, tolls the statute as to the other alleged conspirators, it follows that the tolling effect should apply also to the substantive wrongs underlying the conspiracy; and we so hold.

Although we should not need to say so, in light of the serious charges under discussion and the defendants' interest in their reputations, we emphasize that we do not address here the validity of plaintiff's allegations as to the existence or scope of any conspiracy or other wrongful act material to the merits of this action. We hold only that if plaintiff proves that a conspiracy existed, and that such conspiracy either contemplated or was furthered by affirmative misrepresentations on the part of Robert Arthur, Jean Riddell, or Marise Reynolds, then those misrepresentations vicariously tolled the statute of limitations as to Sally Arthur and Joan Baer with respect both to the conspiracy and to the underlying substantive claims against them. We leave it to the finder of fact to determine whether a conspiracy existed and, if it did, to delineate its scope.

## B. *Notice*

■ Clearly, "the doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim." *Hobson*, 737 F.2d at 35. If it can be determined as a matter of law, therefore, that plaintiff had timely notice of the causes upon which he belatedly sues, then his showing of fraudulent concealment will not prevent the statute of limitations from having run. *Id.* at 38.

■ In *Hobson*, we defined the requisite notice, once the plaintiff has shown that a defendant committed an act of concealment, as "an awareness of sufficient facts to identify ... the particular cause of action at issue, not [notice] of just any cause of action." *Id.* at 35. As discussed above, we distinguished the degree of notice required from that in which no fraudulent concealment has occurred: "We do not mean the kind of notice—based on hints, suspicions, hunches or rumors—that requires a plaintiff to make inquiries in the exercise of due diligence, but not to file suit." *Id.* Here, even if plaintiff was on inquiry notice, he was clearly not on notice sufficient as a matter of law to require him to file this suit.

The circumstances surrounding Buchanan Appraisal II, and Robert Arthur's participation in its preparation, play a central role in plaintiff's fraud, deceit, conspiracy, and RICO claims. As set forth above, the district court found that plaintiff was on notice of those claims by 1983, when he was told that the stock had been sold and when he was shown an appraisal by Buchanan & Co. The court's conclusion was based in part, however, on its erroneous finding that plaintiff was shown Buchanan Appraisal I, including the underlying Buchanan & Co. worksheets setting forth "a range of values for the stock." 680 F.Supp. at 6, 9. The court did not consider the significance of the undisputed fact that Robert Arthur calculated the final figure that was paid for plaintiff's shares.

Even if in 1983 plaintiff suspected that the price paid for his shares was too low, that suspicion cannot be said to have put him on notice as a matter of law of the falsity of the representations that Buchanan Appraisal II was independently prepared, much less given him reason specifically to think that Robert Arthur may have participated in preparing it—facts that are central to his fraud, deceit, conspiracy, and RICO claims.

■ So much is established by *Richards v. Mileski*, 662 F.2d 65 (D.C.Cir.1981).

There the plaintiff had resigned from the United States Information Agency in 1955 under the weight of false charges that he had engaged in homosexual activity. He, of course, knew at the time the charges were made that they were false. He did not know until 1978, however, that his superiors had knowingly filed false reports on which the charges were based. This court held that his tort action against his superiors was not time-barred. The court found that it "was no mere 'detail' in 1955 that the false charges against Richards had been fabricated as part of a deliberate conspiracy against him, or that his own superiors rather than an unknown informant were the source of his misery." *Id.* at 69. Likewise here, plaintiff's knowledge that the price paid for his shares may have been low would not have put him on notice that Buchanan Appraisal II, on which he was induced to rely, was fraudulently prepared. Similarly, assuming that the district court was correct in holding plaintiff to a higher standard of inquiry notice due to his experience in real estate, a proposition on which we need not pass, and assuming that plaintiff's experience should have led him to believe that the price was low, expertise in real estate cannot be used to charge plaintiff, as a matter of law, with notice that Buchanan & Co. might not have prepared the appraisal that was shown to him.

We therefore hold that a jury could reasonably find that plaintiff was not on notice of his fraud and RICO claims, as set forth in the amended complaint, until he learned that Buchanan Appraisal II had been performed by Robert Arthur rather than by Buchanan & Co.[2] Plaintiff was therefore entitled to have the jury consider those counts as against all of the defendants.

### V. BREACH OF FIDUCIARY DUTY

██ Plaintiff alleges that Robert Arthur, Jean Riddell, and Sally Arthur, by "actively participating in the creation of the fictitious valuation of his shares," breached the fiduciary duties that they, as corporate directors, owed to him as a shareholder. This allegation is based upon the same alleged acts of concealment as are the fraud and RICO claims. Therefore, even if affirmative misrepresentations are required to toll the statute when the underlying claim is for breach of fiduciary duty, plaintiff has adduced evidence from which a jury could reasonably conclude that such misrepresentations were made by Robert Arthur and Jean Riddell.

██ As to Sally Arthur, however, as we have already noted, there is no evidence in the record that she affirmatively represented to plaintiff that his stock had been independently appraised. Nor can she be held vicariously responsible for misrepresentations by Robert Arthur or Jean Riddell, since no allegation of conspiracy is involved here. Thus we must determine whether, assuming that Sally Arthur had a fiduciary duty to speak, her silence in the face of that duty amounts to fraudulent concealment.

In *Searl v. Earll*, 221 F.2d 24, 28 (D.C. Cir.1954), this court held that a failure to speak, by one who has a duty to do so, may be sufficient to toll a statute of limitations. The plaintiff Earll, acting as agent for the counterclaimants in procuring a loan, failed to disclose that the lender was his wife. In rejecting his claim that the statute of limitations had run on the counterclaim for usury, this court reasoned that:

> Earll was clearly under a duty to speak, his concealment of the facts constituted fraud, the bar of the statute did not begin to run against the Searls until the

**2.** Plaintiff was put on inquiry notice of a possible fraud claim when he learned of the sale of the two parcels of real estate in 1987. Plaintiff duly inquired, and, on the advice of counsel, filed this action. Because the issue is not before us, we need not comment on the sufficiency of the original complaint under Fed.R.Civ.P. 9. *Cf. Hayduk v. Lanna*, 775 F.2d 441, 443–45 (1st Cir.1985) (in order to survive scrutiny under Rule 9, a complaint alleging fraud must set forth the circumstances of the alleged fraudulent activity). It suffices to say that subsequent discovery produced evidence from which a jury could find that, prior to the filing of this action, plaintiff had no notice—not even inquiry notice—of the evidence from which it now appears that there may have been fraudulent concealment.

fraud had been discovered, the counter-claim sufficiently pleaded the right of the Searls to a remedy, and the pleading was timely.

*Id.* at 28. More recently, in *William J. Davis, Inc.,* 412 A.2d at 1192 n. 12 (D.C. 1980), the District of Columbia Court of Appeals recognized the holding of *Searl* as the law of the District, although the issue of a duty to speak was not directly present-ed. *See also General Aircraft Corp. v. Air America, Inc.,* 482 F.Supp. 3, 8 (D.D.C. 1979) ("absent a duty to speak, mere si-lence ... is not enough to toll the stat-ute").[3] We therefore have no reason to doubt that the District of Columbia Court of Appeals would hold that where there is a fiduciary duty to disclose information on a particular matter, failure to do so will con-stitute fraud or fraudulent concealment that tolls the statute of limitations on any claim as to notice of which that information is material.

We do not, of course, pass upon the merits of plaintiff's claim that Sally Arthur or any of the defendants owed plaintiff a fiduciary duty when the relevant transac-tions took place, a point that the district court did not reach and that defendants vigorously dispute. Nor do we address the question whether that fiduciary duty, if any existed, required disclosure of the cir-cumstances under which Buchanan Ap-praisal II was prepared. We hold only that if Sally Arthur had a fiduciary duty to disclose to plaintiff that Buchanan Apprais-al II was performed by Robert Arthur and not by Buchanan & Co., then her failure so to inform him tolls the statute of limita-tions on plaintiff's claim for breach of that duty, unless plaintiff was otherwise on no-tice of that undisclosed fact. Since there is no evidence in the record to indicate that plaintiff had any such notice until after he filed this action, we cannot hold as a matter of law that plaintiff's claims based upon

the three defendants' alleged fiduciary duties are time-barred.

## VI. OTHER CLAIMS

As to all other claims, we affirm the district court's rulings against plaintiff.

### A. *Violation of the UCC*

■ Plaintiff charges his mother with violating D.C.Code § 28:9-504, which pro-vides:

The secured party may buy at any public sale and if the collateral is a type cus-tomarily sold in a recognized market or is a type which is the subject of widely distributed standard price quotations, he may buy at a private sale.

The essence of this claim is that Jean Rid-dell, as the secured party to the 1979 loan agreement, was prohibited by law from selling the collateral to herself in a private sale.

Tolling aside, the vitality of a claim un-der § 28:9-504 is at the most three years. D.C.Code § 12-301(8). The district court held that plaintiff's UCC claim accrued "when Jean Riddell foreclosed on the stock in the summer of 1981, or at the latest, in the early spring of 1983 when he learned of the sale of the stock to the corporations." 680 F.Supp. at 10. Plaintiff argues that this was error, since he did not know until after the commencement of this lawsuit that Jean Riddell had sold the stock to herself prior to selling it to the corpora-tions.

Plaintiff was aware by 1983 that the corporations had bought his stock and he obviously had notice of the foreclosure pro-vision in the loan agreement he had signed. Although plaintiff asserts that he was nev-er notified that his mother had foreclosed on the note, the information that he had by 1983 was clearly sufficient to put him on

---

**3.** The holding in *Searl* is also consistent with the law in other jurisdictions. *See, e.g., Baskin v. Hawley,* 807 F.2d 1120, 1131-32 (2d Cir.1986); *Rutledge v. Boston Woven Hose & Rubber Co.,* 576 F.2d 248, 250 (9th Cir.1978). We assume, as have the parties in this case, that District of Columbia law governs the statute of limitations issues, including the requirements for fraudu-

lent concealment. *Hodge v. Southern Railway,* 415 A.2d 543, 544 (D.C.1980). Were we to apply Delaware law, under which both corporations are incorporated and from which any fiduciary duty, including a duty to speak, would presum-ably derive, the result would apparently be the same. *See Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149 (Del.1987).

notice of the foreclosure. Even assuming that the statute of limitations on plaintiff's UCC claim did not begin to run until he had notice of that claim, as he argues, his notice of the foreclosure triggered a duty to inquire as to any claims arising from the manner in which the foreclosure was effected.

We need not reach the question whether the statute of limitations for the UCC claim can be tolled by fraudulent concealment, since plaintiff has failed to adduce evidence of such concealment. Plaintiff's UCC claim does not implicate Buchanan Appraisal II; it relates solely to the private sale in which Jean Riddell took the shares in satisfaction of plaintiff's debt. Thus, misstatements made to plaintiff with respect to the manner in which Buchanan Appraisal II was prepared cannot serve to toll that claim.

B. *Conversion*

■ The essence of plaintiff's claim for conversion is that Jean Riddell converted plaintiff's shares to her own use when she foreclosed on the note and purchased the stock herself. (Plaintiff thus assumes that a purchase may in some circumstances amount to a conversion, a theory in which we may indulge him for present purposes.) The district court held that this claim accrued, and the statute of limitations began to run, when the alleged conversion took place in 1981. 680 F.Supp. at 10.

In support of that ruling, defendants point to *Forte v. Goldstein*, 461 A.2d 469 (D.C.1983), in which the District of Columbia Court of Appeals stated that the statute of limitations for conversion is three years from the date of the conversion. In fact, *Forte* did not directly address the issue presented here, since in *Forte* plaintiffs were informed of the events constituting the conversion shortly after they took place but did not bring their action until four years later. 461 A.2d at 471. Other courts have held that the statute of limitations on a claim for conversion does not begin to run until the plaintiff discovers, or in the exercise of diligence should discover, facts that would amount to a conversion.

*See, e.g., Vaughter v. Eastern Airlines, Inc.*, 817 F.2d 685, 692 (11th Cir.1987); *Branford State Bank v. Hackney Tractor Co.*, 455 So.2d 541, 542 (Fla.Dist.Ct.App. 1984). Even if the District of Columbia were to adopt that standard, however, the statute of limitations for plaintiff's conversion claim would have begun to run in 1983, when plaintiff learned that his shares had been sold to the corporations, and his claim would be time-barred.

Plaintiff maintains, however, that the statute did not begin to run until he knew by whom his shares were taken; and he did not know until he learned through discovery under the original complaint that they had been taken from him by his mother and resold to the corporations, rather than taken directly from him by the corporations. As a general proposition, it may be correct to say that a party cannot be expected to sue until he knows (or should know) whom to sue. *See, e.g., O'Keeffe v. Snyder*, 83 N.J. 478, 416 A.2d 862, 872–73 (1980). Whatever merit that argument may have in general, however, it is unavailing here. Plaintiff knew that Jean Riddell was the sole voting shareholder of the corporations, and he admits that he knew in 1983 that the corporations had his shares. Thus, he knew that his mother had either taken (and sold) the shares or had caused the corporations to take the shares directly. Plaintiff was on notice that he had a claim for conversion against some defendant(s), and he could have sued both the corporations and his mother without first having determined with certainty whether his mother had effected the conversion directly or indirectly through the corporate entities she controlled. Therefore, the statute of limitations began to run at that time.

C. *Breach of Contract and Wrongful Transfer*

■ Plaintiff alleges that Jean Riddell breached her contractual duty of fair dealing when she foreclosed on the note, and that the corporations were not *bona fide* purchasers when they took the shares from her. Each of these claims is subject to a

three-year statute of limitations. D.C.Code §§ 12–301(2), (7), (8).

The district court was correct in dismissing both claims, which accrued in 1981 when Jean Riddell foreclosed on the stock. We need not reach the question whether the statute of limitations began to run then or only when plaintiff learned of the underlying transactions, since he was on notice of the foreclosure and of the sale of his stock to the corporations at the latest by 1983. He had a duty to inquire into the propriety of those transactions as of that time. There is no evidence that defendants committed affirmative acts to conceal the contract and wrongful transfer claims. Thus we need not reach the issue of whether fraudulent concealment would toll the applicable statute of limitations.

## VII. CONCLUSION

Although our dissenting colleague differs with us at many places along the way and ultimately as to the appropriate disposition of plaintiff's RICO and common law fraud, deceit, conspiracy, and breach of fiduciary duty claims, we think that our divergence in views stems from only three basic points. Two of them relate to the inferences that can properly be drawn from the record before us with respect to certain critical points of fact, and one is a point of law.

As for the point of law, we differ with Judge Rosenn as to the appropriate standard for notice once plaintiff has adduced evidence of an affirmative misrepresentation. Although Judge Rosenn apparently does not agree, we think, as discussed earlier in our opinion, pages 1490–91, 1494, that our decision in Hobson compels the conclusion that once a showing of an affirmative misrepresentation has been made, mere inquiry notice is insufficient to set the statute of limitations running anew.

With respect to the facts, first, we disagree with Judge Rosenn as to the inferences a jury could reasonably draw with respect to the appraisal that Jean Riddell showed the plaintiff in 1983 when she informed him that his shares had been sold. As discussed earlier, pages 1487–89, we think that, on the record before us, a jury could reasonably conclude that (1) there were two "Buchanan Appraisals," one containing only the range of figures produced by Buchanan & Co. (Buchanan Appraisal I), and the other containing only Robert Arthur's subsequent reworking of those figures (Buchanan Appraisal II); and (2) plaintiff was shown only the latter appraisal.

Second, we think that Judge Rosenn is too quick to accept defendants' claim that Jean Riddell effected two separate transactions—first purchasing plaintiff's shares herself in a private sale for the outstanding balance of plaintiff's loan, and subsequently reselling the shares to the corporations for the amounts set forth in Buchanan Appraisal II—and that as a result all evidence pertaining to Buchanan Appraisal II is irrelevant to his claim. It is possible that a jury might ultimately be persuaded that two transactions occurred and that plaintiff had no interest in the second transaction. As noted above, we think that even if a jury finds that two transactions occurred—and we do not think that the evidence in the present record would compel it so to conclude—it could still find that the evidence that plaintiff was shown Buchanan Appraisal II when he inquired about the ultimate disposition of his stock prevented him from investigating further any transaction in which he did have an interest.

Both of these factual disagreements with Judge Rosenn may stem from a single difference in what we mean when we say, as we both do, that the non-moving party on a motion for summary judgment must be given the benefit of all reasonable inferences with respect to disputed material facts. We have drawn inferences in plaintiff's favor that Judge Rosenn, like the district judge, resolves against him, as a jury might well do. We, however, think that plaintiff has adduced sufficient evidence on these points to raise genuine and material issues of fact.

We are mindful of the Supreme Court's admonition that summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral

part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2252–53. *See also Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. Accordingly, we have encouraged the district court to give serious consideration to the summary judgment procedure whenever it appears that its use may be appropriate. *Liberty Lobby v. Dow Jones & Co.*, 838 F.2d at 1292; *Veg–Mix, Inc. v. U.S. Dep't of Agriculture*, 832 F.2d 601, 608 (D.C.Cir.1987). Nothing in this decision should be seen as beclouding the "favorable climate for summary judgment" that we have previously noted. *Kozup v. Georgetown University*, 851 F.2d 437, 439 (D.C.Cir.1988).

On the other hand, we must also stress the importance, in a case involving multiple claims and multiple parties, of closely and separately examining the sufficiency of the evidence with respect to each claim as against each party to whom it relates. Particularly in an action such as this, where the question whether plaintiff's claims are time-barred turns on whether affirmative misrepresentations by the defendants are material to the theory underlying each claim, *see Hobson*, 737 F.2d at 35, it is essential that the district court examine the evidence in light of the particular theory alleged. *Cf. Kozup*, 851 F.2d at 439–40 (affirming summary judgment on one claim for want of a showing of "material risk," but reversing on another count where "material risk" had not been fully imported into the theory of recovery). As the result reached here illustrates, the evidence may support summary judgment on some claims and yet not on others, even though all of the claims may be closely related in origin. Nothing in today's opinion should discourage the district court in such a situation from looking for, and granting summary judgment on, those claims as to which the standard of *Celotex* and *Liberty Lobby*, set out above, *see* pages 1484–1485, is met.

In light of our holding that a jury could conclude that plaintiff's claims for violations of RICO and common law fraud, de-

ceit, conspiracy, and breach of fiduciary duty were fraudulently concealed from him by one or more of the defendants, we reverse the district court's order granting summary judgment as to those counts and remand for further proceedings. Because plaintiff has not adduced evidence from which a jury could reasonably conclude that his claims for conversion, violation of the UCC, breach of contract, and wrongful transfer are not time-barred, we affirm as to each of those counts. Finally, because the district court did not rule on plaintiff's claims for federal securities fraud and replevin, we remand those claims for initial proceedings in the district court.

For the foregoing reasons, the judgment of the district court is

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

ROSENN, Senior Circuit Judge, concurring and dissenting:

I concur with the majority that the plaintiff has not adduced evidence from which a jury could reasonably conclude that his claims for conversion, violation of the Uniform Commercial Code, breach of contract, and wrongful transfer are not time-barred, and that the dismissal of these counts should be affirmed. However, I believe the district court did not make any erroneous findings of fact and that the remaining counts of plaintiff's alleged cause of action are also time-barred. I, therefore, respectfully dissent from the majority's reversal of these counts and its remand of plaintiff's claims of federal securities fraud and replevin to the district court for initial proceedings.

I.

A. *The Loan to Roland Riddell*

Because the majority and I disagree, in part, as to the conclusions to be drawn from the record, I will substantially recount the facts in this dissent. Giving the non-moving party the benefit of all *reasonable* inferences of disputed material facts, as we are bound to do on a motion for summary judgment, I believe that the

record establishes the following pertinent facts. The genesis of this controversy between the plaintiff and the defendants arises out of plaintiff's recurrent financial difficulties which became acute in 1978. The plaintiff, age fifty-one, whom the district court found to be "a savvy business person involved in the real estate business since the early 1960's," *Riddell v. Riddell Washington Corp.*, 680 F.Supp. 4, 5 n. 3 (D.D.C.1987),[1] sought a bank loan of $150,-000 in 1978 to meet his pressing business expenses. He offered his stockholdings in RWC and RPI as collateral.

To support his representation that his stock in the two corporations was worth at least $150,000, plaintiff obtained an appraisal of the underlying properties owned by the corporations from Joseph L. Donnelly, a well known real estate appraiser in Washington, D.C. Donnelly fixed the value for the properties, subject to the ground leases, at $2,854,000, and thereby established that plaintiff's interest amounted to at least $150,000. Although the Donnelly Appraisal was sufficient for plaintiff's purpose of obtaining the desired loan, plaintiff believed that his stock at the time was worth at least 25% more than the $150,000 loan he sought.[2]

As the district court found, the Donnelly Appraisal stated that the ground leases were to be renegotiated on the basis of a percentage of the land value of the properties at the time of renegotiation. *Riddell,*

680 F.Supp. at 6 n. 5. The appraisal estimated that the 1981 renegotiation of the RWC lease would result in a substantial rental increase from $40,000 to $133,875, and that the 1992 renegotiation of the RPI lease would produce a rental increase from $36,000 to $86,700. The bank nevertheless rejected the loan request because it concluded that the stock was unmarketable. However, it proposed to make the loan if the corporations would agree to purchase the stock in the event of default.

Reacting to the bank's proposal, plaintiff requested that his mother, the corporation president, call a directors' meeting, which she did. The corporation, however, refused to enter into a commitment with the bank to buy back the plaintiff's stock or to guarantee payment in the event of default. Confronted with her son's urgent need for the money, Jean Riddell personally offered to lend him the $150,000.[3] She made no offer to purchase plaintiff's stock for $150,-000 because, as his sister Sally testified, "I think she was trying to give Roland the chance to stay in the family businesses and to redeem his stock by paying off the loan."

The next day, the plaintiff personally typed and executed a promissory note for $150,000 to his mother, endorsed his stock certificates in blank, and delivered them together with the note (dated January 3, 1979) to his mother in exchange for the

1. The plaintiff, a college graduate with a bachelor's degree in Business Administration, exhibited extensive real estate experience, dating back to 1968. When deposed in 1987, he was serving as president of the Mortgage Investment Corporation, and immediately prior thereto had been president of the Century Mortgage Company. Between 1981 and 1983, he had brokered real estate loans, and between 1974 and 1981, he had served as president of Mortgage America, an organization of mortgage bankers. Prior to 1974, he had also served in various capacities for other mortgage and real estate companies, including, for a brief period between 1968 and 1969, Riddell Realty.

2. However, the plaintiff also stated, rather inconsistently, that the corporation was in fact "worse off than the Donnelly appraisal showed," and that the stock was worth less than the appraisal. He attributed this diminution in val-

ue to several considerations which Donnelly did not take into account: "One was that we were trapped ... in a very poor tax situation with the corporate structure we had.... [T]he leases were very poor, and although they appeared to have a certain income stream, the lessees could virtually mortgage us out of existence if they wanted to, and that these were leases that somebody wouldn't use today."

3. Lending money to Roland or assisting him in borrowing was not an unusual experience for his mother. According to the plaintiff, he borrowed $23,000 from his mother in 1966 which he did repay. In 1976 he borrowed a total of $21,000, at least $10,000 of which he admits he did not repay. In 1981, his mother co-signed a $75,000 bank loan which "she had to repay" when he defaulted. She loaned him an additional $3,000 in 1983 which also remains unpaid.

loan.[4] The note expressly gave Mrs. Riddell "authority to sell, transfer, [and] rehypothecate said collateral." The note further provided that in the event of default the holder is given full power and authority to sell the collateral at "public or private sale [at] the option of the holder, without demand, advertisement, or notice," and, after deducting the legal costs and expenses of the sale, to apply the residue of the proceeds to payment of the debt. The surplus, if any, was to be returned to the maker with a full and accurate accounting. As the majority observes, the note also provided that in the event of default, plaintiff's sisters would have a thirty day option to redeem the collateral by paying the principal and interest due the holder, thus relieving plaintiff of further liability.

The plaintiff defaulted in the repayment of the loan in 1979, but his mother did not exercise her rights under the note until several years later. In the meantime, the plaintiff failed to make any payment of principal or interest.

The ground leases on the RWC property became subject to renegotiation as of June 30, 1981. As the Donnelly Appraisal had predicted in 1978,[5] the rentals were substantially increased on April 15, 1981, although the increase exceeded the Donnelly prediction.

## B. *The Foreclosure*

By the spring of 1981, the plaintiff's financial condition had worsened considerably. Apparently in response to a request from Jean Riddell, Robert Arthur, manager of the corporation's affairs and Mrs. Riddell's financial advisor, informed her by letter dated May 5, 1981, that Rolan's loan was in default, that the current balance was then $216,484.55, and that Roland had

indicated his inability to repay. Arthur suggested that Mrs. Riddell protect her interest by declaring the note in default and then recovering her money through a sale of the collateral. Around this time, Roland also talked with his mother who "was concerned that my creditors were going to come and get the stock...." Alarmed at the prospect of her son's creditors garnishing his stock and becoming an intrusive force in a longstanding family business, his mother reluctantly considered foreclosure of his stock. She consulted with other members of her family who expressed similar concerns.[6]

Jean Riddell ultimately foreclosed on Roland's stock in July 1981 and sold the shares to herself for the outstanding balance of the loan which, as of May 5, 1981, was $216,484.55. With interest accruing, the debt undoubtedly exceeded that sum at the time of foreclosure. Although Roland disputes his mother's testimony that in July 1981 she personally sent him a handwritten letter of her intent to foreclose, this fact is immaterial; the very terms of the note permitted the holder to foreclose on default, at either public or private sale, without further notice to the debtor.

## C. *The Buchanan Appraisal*

On September 20, 1981, the Board of Directors of RWC held a special meeting, one of the purposes of which was to discuss the disposition of the foreclosed stock. With Mrs. Riddell abstaining, the Board voted on a motion of Arthur, a director and vice president, that an independent valuation of the foreclosed stock be obtained in order to prepare an offer of its purchase by the corporation from Mrs. Riddell.

---

**4.** For the most part, the note tracked the language of the promissory note that Roland had obtained from the Security National Bank.

**5.** The district court found that the Donnelly Appraisal, which plaintiff secured and read in 1978, "stated on its face the date on which the rental prices would increase and the fact that the renegotiated rents would be based on a percentage of the land value of the property. The plaintiff was on notice of the fact that the rents would increase from an appraisal he him-

self obtained." *Riddell,* 680 F.Supp. at 6 n. 5. This finding of fact is not clearly erroneous, and plaintiff's claim that he was not on notice of the anticipated rental increases must be rejected.

**6.** By letter dated June 8, 1981, Arthur wrote Mrs. Riddell, sending for her approval a form of notice to be given to Roland of her intention to foreclose and asking for instructions "on what we are going to do."

Several days later, Arthur wrote to Buchanan & Co. (Buchanan), which Roland identified as "a very well known CPA firm." In his letter Arthur requested that Buchanan prepare an informal valuation of the corporations' stock to be used as a basis for the corporate purchase of the foreclosed stock. Arthur further requested that Buchanan advise him as to what information would be needed for the valuation. Apparently in response to Buchanan's request for further information, Arthur forwarded the data they needed to "render an opinion of value for an 'arm's length purchase[]'" of the foreclosed stock. The accompanying letter, dated October 28, 1981, advised that the stock was in non-traded, closely held "family corporations." The data sheet concluded with the statement that, upon arriving at the value for the corporations, Buchanan should, "*if appropriate,* indicate a substantial factor for discount (35% to 50%) as to the nature of the securities being purchased." (Emphasis added).

The Buchanan Appraisal, which Ronald Dungan, the accountant who supervised its preparation, believed to be accurate when prepared in 1981, in hindsight, was faulty. The principal errors in the valuation stemmed, however, not from any suggestion or input by Arthur, but from Buchanan's own shortcomings.[7] Although Buchanan may have failed to arrive at an accurate valuation of the corporate stock, it nonetheless made an independent valuation.

Furthermore, the valuation was made, not for the purchase of "plaintiff's equity interest," Maj. Op. at 1488, but for the clearly established purpose of making an offer to Jean Riddell for the foreclosed stock acquired by her several months earlier. In submitting the offer of purchase to Mrs. Riddell, however, Arthur arbitrarily reduced the Buchanan valuation by an additional discount and arrived at a very low figure of $106,936.00 (Arthur computation). Surprisingly, inasmuch as Mrs. Riddell now had well over a $220,000 investment in the stock, including accrued interest, she accepted the offer and was paid $106,936.00, less than 50% of her son's total unpaid debt. Whatever shortcomings there may have been in the offer, however, the shares were now the property of Jean Riddell, not that of the plaintiff.

The majority labels the Arthur computation as "Buchanan Appraisal II," Maj. Op. at 1488, a characterization and identification which may not be only confusing but also one which I do not believe is supported by the record. It is undisputed that Buchanan made only one appraisal. That appraisal makes no reference whatsoever to the Arthur computation which the majority characterizes as "Buchanan Appraisal II." *I therefore refer throughout this dissent to the Buchanan financial statement as the Buchanan Appraisal and to the Arthur computation as such, both of which are so described in plaintiff's complaint and testimony.*

On a more substantive level, the majority concludes that because plaintiff testified he only saw the Arthur computation we must accept his statement as conclusive that he did not review the Buchanan Appraisal and

---

7. The majority construes Arthur's suggestion to discount the value of the stock as "instructions" to Buchanan and thus concludes that this suggestion destroyed the independence of the appraisal. Maj. Op. at 1487–88. I disagree with this characterization. Arthur was merely suggesting or reminding Buchanan of a common practice in the marketplace of discounting stock in closely held, non-traded family corporations. Dungan testified that he discounted because of the nature of the corporations and because the underlying properties were subject to unexpired ground leases. He based the precise discount factor on his "experience for state tax valuation." Notably, the Donnelly report obtained by plaintiff had taken a similar discount.

The Buchanan appraisal was apparently flawed, however, though due neither to a lack of independence nor to the use of a discount. Instead, the error can be attributed to (1) Buchanan's failure to recognize that the Donnelly appraisal, which formed one of the four bases for the valuation, had already been discounted to account for the reduced marketability of the stock; and (2) its failure to incorporate the increased rentals resulting from the recent renegotiation of the ground leases. Both these errors arguably resulted in an undervaluation of the corporations' stock.

hold that the district court's factual finding to the contrary is erroneous. I disagree.

Both plaintiff's complaint and his testimony acknowledge that the Buchanan Appraisal and the Arthur computation appear on separate sheets of paper. The plaintiff claims that when his mother informed him in March 1983 of the sale of his stock, she told him that it had been independently appraised but she did not show him the Buchanan work sheets. Although plaintiff does not dispute his mother's testimony that the Buchanan Appraisal was attached, he claims that she only showed him "the 'Stock Valuation' made up by Robert Arthur, but printed on Buchanan & Company stationery." A court is not bound, however, to accept affidavits or testimony of a party even for purposes of summary judgment, when it is inconsistent with that party's own testimony or at odds with documentary evidence as it is here.

First, Roland testified that the document which he reviewed was printed on Buchanan stationery. Notably, the Arthur computation, produced as part of plaintiff's Exhibit 14, appears on a single, plain sheet of paper, not on Buchanan's stationery. Nowhere on its face does the document purport to be an appraisal by Buchanan or any part thereof. On the other hand, the Buchanan Appraisal, which is preceded by a transmittal letter printed on Buchanan stationery and bears the Buchanan corporate signature, appears to more closely resemble the document reviewed by plaintiff.

Plaintiff also testified that the document his mother showed him mentioned "that due to the limited market, et cetera, et cetera, this is all we can appraise it for." No such language appears in the Arthur computation. On the other hand, the Buchanan Appraisal does use language similar to the language recalled by plaintiff. For example, the Buchanan Appraisal discounts the 1730 K Street property of the RWC at 50% "because of lack of marketability due to minority interest and 74 years to run on lease." The Buchanan Appraisal valuating 2801-3 and 2737 Connecticut Avenue also discounts these properties at 33⅓% "because of lack of marketability due to minority interest."

Given plaintiff's recall of the details contained only in the Buchanan Appraisal and notably absent from the Arthur computation, the district court could reasonably conclude that the plaintiff did review the Buchanan Appraisal when his mother showed him the Arthur valuation. Even on motion for summary judgment, a court may disregard a conflicting affidavit or statement that is manifestly untenable. *See Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 706 (3d Cir.1988); *Van T. Junkins & Assoc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). Therefore, I do not believe that this court can appropriately hold that the district court's finding of fact is erroneous.

### D. Sale of the Corporations

In December 1986, more than five years after the leases had been renegotiated and more than three years after plaintiff claims he learned of the price paid for his stock, the corporations were liquidated, and their assets and liabilities were transferred to Jean Riddell, Sally Arthur, Marise Reynolds, and Joan Baer as partners. (¶ 50 Amended Cplt.). Earlier that year, the ground lessee of the corporations' properties decided to purchase the fee title to the land because of proposed "changes in the tax laws" and the prospect of rental increases "down the road." The lessee initiated discussions in September 1986 and completed them on December 31, 1986, with an agreement on the part of the purchaser to pay the partnership $13,000,000. The plaintiff alleges that in February 1987 his mother informed him of the sale of the ground leases and shortly thereafter he unsuccessfully attempted to obtain information, both personally and through counsel, concerning the sale of "his shares." (¶ 52 Amended Cplt.). The plaintiff commenced these proceedings on April 3, 1987.

### II.

The majority holds "that a jury could reasonably find that at least some of the defendants actively concealed plaintiff's

RICO and common law fraud, deceit, and conspiracy claims from him" thus tolling the statute of limitations, and reverses the district court's order granting summary judgment as to those counts. Maj. Op. at 1491. In light of the plaintiff's own testimony and his Exhibit 14 (Arthur computation), I do not see how any jury could reasonably reach such a conclusion.

## A. *The RICO and Fraud Claims*

The statute of limitations periods for both the RICO count and the fraud count are similarly applied. The four year statute of limitations period for plaintiff's RICO claim and the three year statute of limitations period for the fraud claim accrue on the date plaintiff discovered, or should have discovered through the exercise of reasonable diligence, the fraudulent activity in question. *Hartford Life Ins. Co. v. Title Guarantee Co.*, 520 F.2d 1170, 1174 (D.C.Cir.1975). As the district court here stated, where plaintiff did not actually discover the alleged fraud, the court inquires as to whether " 'storm warnings' of the possibility of fraud trigger[ed] a plaintiff's duty to investigate in a reasonably diligent manner." *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir.1987). The court will make an objective inquiry to determine if and when the plaintiff possessed sufficient knowledge of the alleged fraud to require him to proceed diligently, and whether plaintiff actually exercised the requisite due diligence.

Based on the above standards, the district court found that the limitations period here accrued on the date of sale, or, at the latest, in March 1983, both of which would result in a finding that the claims are time-barred. Plaintiff argues, however, that under the doctrine of fraudulent concealment, the statute of limitations for both the RICO and fraud claims should be be tolled until February 1987 when he claims to have learned the true value of his stock.

### 1. *Fraudulent Concealment*

The doctrine of fraudulent concealment tolls the statute of limitations when the defendant has fraudulently concealed facts that prevented the plaintiff from discovering the alleged fraud. The majority concludes that, under the facts presented here, the plaintiff has adduced sufficient evidence to go to the jury on both the self-concealing and the subsequently concealed theories of fraudulent concealment, and reverses the district court's order as to the counts of RICO and common law, fraud, deceit, and conspiracy. Maj. Op. at 1491.

The majority reaches this conclusion as to Robert Arthur holding that "his instruction" to Buchanan to discount their appraisal, combined with his expressed expectation that plaintiff might well challenge the resulting valuation, that is, the figure produced by Arthur's further discount, "constituted sufficient evidence for a jury to conclude that Arthur defrauded plaintiff as to the existence of his cause of action." Maj. Op. at 1492. However, as I have already shown, Arthur never gave any instruction to Buchanan to discount the stock, but merely made such a suggestion, an indisputable standard practice with respect to valuations of non-trading minority interest stock. As to Arthur's expectation that "plaintiff might well challenge the resulting valuation" that expectation, for what little evidentiary value it might have, was only expressed in the November 22, 1981, board meeting with respect to the Buchanan Appraisal. There never was expressed any expectation that a similar challenge might be made with respect to "the figure produced by Arthur's further discount," the Arthur computation for the offering price. Thus, the premises upon which the majority reaches its conclusion are faulty.

As to Jean Riddell, the majority concludes there is sufficient evidence of fraudulent concealment to go to the jury because "a jury could reasonably conclude that her presentation of Buchanan Appraisal II to plaintiff and her representation to him that the appraisal had been performed independently constituted an affirmative misrepresentation." Maj. Op. at 1492. However, Jean Riddell only represented to plaintiff that the Buchanan Appraisal had been performed independently. Moreover, as I discuss *infra* at 1505–06, the plaintiff

could not have mistaken the Arthur computation for the Buchanan Appraisal because any examination of that computation disclosed on its face that it did not constitute an appraisal by Buchanan or anyone else, or purport to be an appraisal, and could not be considered to be an appraisal by any reasonable person.

As to Marise Reynolds, the majority concludes that "her representation to plaintiff that his stock had been independently appraised, when she knew that it had not, could reasonably be found to constitute an affirmative misrepresentation." Maj. Op. at 1492. Marise Reynolds' representation, however, was directed only to the Buchanan Appraisal, not to the Arthur computation. Her representation was neither incorrect nor an affirmative misrepresentation. Even if we were to assume, arguendo, that Arthur had "instructed" Buchanan to take a discount, there is no evidence that Reynolds was aware of such "instruction."

The majority further concludes that acts of fraudulent concealment may be imputed to the corporations based on a theory of agency, and to Sally Arthur and Joan Baer based on a theory of conspiracy. However, as I have demonstrated, because Robert Arthur, Jean Riddell, and Marise Reynolds have not engaged in any such acts, neither the corporations, nor Sally Arthur or Joan Baer may be charged with acts of fraudulent concealment.

For reasons already discussed, there is no evidentiary basis upon which a jury could reasonably believe that any of the defendants intended that plaintiff be lulled by the Arthur computation into accepting as reasonable the amount that Jean Riddell had paid for the stock in the initial sale. For the same reasons, a jury could not reasonably find that plaintiff's belief that the Arthur computation represented an independent appraisal prevented him from challenging either the initial sale or her

subsequent sale to the corporation. Therefore, the district court properly refused to toll the statute of limitations.

### 2. *Notice*

Even assuming, arguendo, that the majority is correct in holding that defendants engaged in acts of fraudulent concealment, the doctrine of fraudulent concealment "does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim." *Hobson v. Wilson,* 737 F.2d 1, 35 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). A plaintiff is charged with possessing notice of his potential claims either (1) when a plaintiff is apprised of the facts unique to a claim (actual notice); or (2) when a plaintiff has not exercised due diligence in conducting an inquiry upon knowledge of facts that indicate a possibility of a cause of action (inquiry notice). *See id.* at 35 & n. 107; *Foltz v. U.S. News & World Report, Inc.,* 627 F.Supp. 1143, 1150 (D.D.C.1986). Therefore, where a plaintiff "has learned of facts which would cause a reasonable person to inquire further," and has failed to investigate, that plaintiff "is charged with the knowledge of all facts such an investigation would have disclosed." *Jensen v. Snellings,* 841 F.2d 600, 607 (5th Cir.1988); *accord Grant v. U.S. News & World Report, Inc.,* 639 F.Supp. 342, 349 (D.D.C.1986).

Here, the information contained in the Arthur computation alone should have provided Roland the necessary notice to further investigate the transaction rather than have "prevented him from investigating further any transaction in which he did have an interest" as the majority holds. Maj. Op. at 1498. When the language of the Arthur computation[8] is parsed, one finds the following:

---

8. Except for the date, caption, and the handwritten figure at the bottom, the sheet in its entirety consists merely of the following twelve typewritten lines:

   RIDDELL WASHINGTON CORPORATION
   Regarding the accounting report on the prospective purchase by the corporation of the

common stock held by Jean M. Riddell (see report, dated 5 November 1981) the following data is assessed as follows:

Four methods of valuation were used to determine a mean value of the corporation assets before any attempt was made to value

(1) the opening paragraph refers to a second report, "the accounting report," dated November 5, 1981, and then makes an assessment of the data that follows.

(2) In assessing that data, Arthur observed that "[f]our methods were used to determine a mean value of the corporation assets before any attempt was made to value the stock itself." Then follows the mean value with discounts.

(3) As to the "Riddell Properties," there is only a single line setting forth the "mean value" less discounts.

(4) The handwritten figure merely aggregates the mean values for both corporations less discounts.

Any reasonable person reviewing this sheet, let alone a "savvy business person" familiar with these very properties, who had himself obtained an appraisal from a "very good" real estate appraiser within the preceding five years, would have recognized that it did not purport to be an appraisal of the underlying properties, the corporations' primary assets. And it certainly was not a financial statement or audit, informal or formal, of the corporations by a certified public accounting firm. The opening lines, moreover, put him on notice that there was an "accounting report" dated November 5, 1981, presumably the Buchanan Appraisal, out there somewhere, if not attached to it. In addition, the Arthur computation notes that four methods of valuation were used to determine the mean value, but does not describe those methods, the omission of which should have notified the plaintiff that another report relevant to the valuation existed. The Arthur computation itself clearly indicated, therefore, that a prior accounting report, presumably the Buchanan Appraisal, formed the basis for the computation which should have prompted any reasonable person to make further inquiries.

Plaintiff, however, made no effort to obtain that essential underlying document.

Moreover, given plaintiff's extensive real estate experience and his own testimony, I find incredible his claim that he relied upon either the Buchanan Appraisal or the Arthur computation, which he claims he believed to be the Buchanan Appraisal. Plaintiff plainly believed that any real estate valuation was of limited benefit when prepared by accounting firms such as Buchanan. As plaintiff testified, these firms, which are comprised of accountants and CPAs, "refer all the time to appraisals, but they don't go out and do appraisals." On the other hand, he implicitly conceded that a valuation by a real estate appraiser, such as Donnelly, is more reliable because they "[do] the appraisals; Buchanan & Company does what CPA's do." Furthermore, plaintiff believed that even real estate appraisals were of questionable value in assessing property encumbered by long-term leases such as the ones held by RWC and RPI. As he testified, "most appraisers in this area, even though they are MAI's [Member of the Appraisal Institute] are not experienced in appraising properties with 99 year leases."

Plaintiff also knew that the stock value depended upon the value of the underlying properties which, in turn, would be highly dependent upon rental revenue. Because he should have known, if only from the Donnelly report, that rentals would be renegotiated and increased in 1981, he had good reason to be "shocked at what the value was" when he was shown the Buchanan Appraisal in 1983. Yet, he did nothing. He never attempted to obtain an update on the Donnelly Appraisal or even to obtain a new independent appraisal. He never asked for an opportunity to see the newly negotiated terms of the ground leases. He never even requested corporate financial statements from his mother, the president of the corporations.[9]

the stock itself or to discount the stock because of "family held and nontrading"
Mean value $758,250.00 × 25% = $189,562 × 50% = $94,781
RIDDELL PROPERTIES
Mean value $221,000 × 11% = $24,310 × 50% = $12,155

9. During this period, the plaintiff acknowledges that he was still borrowing money from his mother, see *supra* note 3, as well as receiving annual gifts from her of $10,000 through 1987, and annual payment of college tuition for his several sons, in addition to private academy fees for others.

Moreover, when plaintiff obtained the Donnelly Appraisal, he believed from that appraisal that his interest in the underlying properties had a value of at least $150,000, even after Donnelly had discounted the value by 50%. Yet, in spite of this information, and common knowledge that real estate values generally were rising in the urban United States during this period, he failed to act when he discovered in March 1983 that the sale price to the corporation was substantially below what he considered to be the value of his interest in the properties in 1978 and that it was even below the earlier Donnelly Appraisal.

Under the foregoing circumstances, which demonstrate the information possessed by and available to plaintiff, no jury could reasonably believe that the Buchanan Appraisal or the Arthur computation prevented plaintiff from timely challenging either the initial sale to Mrs. Riddell or her sale to the corporation. Therefore, the district court properly refused to toll the statute of limitations.

### B. *Federal Securities Fraud and Replevin Claims*

I agree with the majority that the federal securities fraud and replevin claims were included only in the amended complaint and were not directly addressed by the district court. However, plaintiff has not challenged the district court's authority to dismiss the case without directly addressing these claims. Rather, plaintiff treats the claims as if they had been denied by the court and argues that they are not time-barred. There is no reason, therefore, that, in the interest of judicial economy, we should not dispose of them now.

A replevin action lies to recover possession of personal property wrongfully taken and detained. *Wardman–Justice Motors, Inc. v. Petrie,* 39 F.2d 512, 515 (D.C.Cir. 1930). As the district court found with respect to the claims of conversion and wrongful transfer, the wrongful transfer, if any, occurred upon the foreclosure in July 1981. Because the state of limitations for replevin is only three years, D.C.Code § 12–301(2), the limitations period ran in

July 1984, or, at the very latest, in March 1986, three years after plaintiff claimed that he learned of the foreclosure. The replevin action is therefore time-barred.

Plaintiff claims that Jean Riddell violated the federal securities law, Rule 10b–5, by failing to disclose the rental increase of the ground leases and the corresponding increase in the value of his shares of stock. As determined by local law, this claim accrues upon the contract of sale and is subject to a two year statute of limitations. D.C.Code § 2–2613(e). *See also Forrestal Village, Inc. v. Graham,* 551 F.2d 411, 414 (D.C.Cir.1977); *Grant v. U.S. News & World Report, Inc.,* 639 F.Supp. at 347. As plaintiff acknowledges, the contract of sale occurred in July 1981 when Jean Riddell foreclosed on the stock and purchased the stock herself. (¶ 72 Amended Cplt.). Because the limitations period ran in 1983, this final claim is also time-barred.

### III.

As discussed above, p. 1502, I do not see how on this record a fair-minded jury could reasonably conclude that there were two Buchanan appraisals. Even if the plaintiff were shown only the Arthur computation, as he claims, and not the Buchanan Appraisal, as the district court found, no jury could reasonably find that the Arthur computation constituted an appraisal by Buchanan. There was nothing in that computation that prevented him from investigating further any transaction in which he did have an interest. On the contrary, by its very nature, substance, and plaintiff's claim that he was "shocked" when he saw the handwritten figure, the computation should have prompted further inquiry and investigation. The plaintiff admittedly did nothing, and I see nothing in the record upon which a fair-minded jury could find evidence of self-concealing or affirmative acts of fraud by Mrs. Riddell and her co-defendants.

I believe that the district court neither made any erroneous findings of fact nor disregarded any genuine issues of material fact which would preclude the grant of sum-

mary judgment in this familial dispute. I would, therefore, affirm the judgment of the district court in every respect.