# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 10, 2008          Decided October 24, 2008

No. 07-7141

AHMAD CHALABI, ET AL.,
APPELLANTS

v.

HASHEMITE KINGDOM OF JORDAN, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 04cv01353)

*John J.E. Markham II* argued the cause and filed the briefs for appellants.

*Christopher M. Curran* argued the cause for appellees. With him on the brief were *Nicole E. Erb* and *Antonia R. Soares*.

Before: RANDOLPH, ROGERS, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*:  On August 11, 2004, Ahmad Chalabi sued the Hashemite Kingdom of Jordan in federal court, alleging a civil RICO conspiracy and various torts related to Jordan's seizure of his bank some fifteen years earlier.  Finding that Chalabi had alleged facts supporting jurisdiction over a foreign sovereign, the district court dispensed with jurisdictional discovery and dismissed Chalabi's claims as time-barred.  We agree with both the approach and the result, and so affirm.

## I.

Because the district court granted Jordan's motion to dismiss, Chalabi's allegations must be taken as true.  *E.g.*, *Rasul v. Myers*, 512 F.3d 644, 654 (D.C. Cir. 2008).  Read with that uncritical eye, the complaint relates the following.

Ahmad Chalabi, an opponent of Saddam Hussein's regime in Iraq, founded Petra Bank in Jordan in 1977.  Compl. ¶ 15.  Over the next twelve years, he grew Petra into Jordan's second-largest bank, with a net worth of thirty million Jordanian dinars or about $42,000,000 at today's rates.  *Id.* ¶¶ 26-28.  As Chalabi's status as an international financier grew, so too did his vociferous criticism of Saddam Hussein and the Jordanian government, which he charged with complicity in Saddam's wrongdoings.  *Id.* ¶¶ 31-33.

According to Chalabi, his political enemies in Jordan returned to power in the spring of 1989 when Mudhar Badran reassumed the prime ministership and appointed Muhammed Saeed El-Nabulsi governor of the central bank.  Compl. ¶ 21.  Nabulsi had occupied this position until 1985, having spent the intervening period in Iraq associating with the "notorious" Iraqi security agency known as the "Mukhabarat."  *Id*. ¶¶ 20-21.  Chalabi alleges that his public criticisms of Saddam and

the Jordanian government angered Nabulsi and Badran, leading them to plot a state takeover of Petra Bank under false pretenses. *Id.* ¶¶ 34, 38. At the same time, one of Nabulsi's deputies delivered an explicit threat, telling Chalabi that Nabulsi's sole purpose in returning to Jordan was "getting" him. *Id.* ¶ 38.

Jordan swiftly laid the groundwork for seizing the bank. In June 1989, the government circulated a denunciatory leaflet entitled "Save What Remains of Petra Bank," designed to discredit Chalabi and to undermine the confidence of Petra's depositors. Compl. ¶ 39. According to the complaint, Nabulsi simultaneously convinced other Jordanian banks to cease overnight deposits with Petra, reducing its operating reserves. *Id.* ¶ 40. Nabulsi then closed the central bank's discount window to Petra, preventing it from obtaining operating cash and precipitating a liquidity crisis. *Id.* ¶ 41. The following day, acting under a martial law decree from Jordan's Economic Security Committee, the state seized the bank by military force. *Id.* ¶¶ 42-45. Nabulsi ordered Chalabi to remain in Jordan and to serve on the bank's new management committee, but according to Chalabi, this was a pretext to facilitate his kidnapping by the Mukhabarat. Warned of the plot, Chalabi fled Jordan on August 7, 1989, never to return. *Id.* ¶¶ 46-47.

Jordan's management rapidly—and, Chalabi says, intentionally—decimated the bank's balance sheet. Two weeks after the takeover, the new management committee foreswore responsibility for the actions of prior management, effectively eliminating the bank's ability to do business. Compl. ¶¶ 50-51. Chalabi alleges that chicanery with the books created an appearance of insolvency, allowing Nabulsi to exploit his role as regulator in order to loot Petra of its assets. *Id.* ¶¶ 52-54. From its pre-seizure capital of 30

million dinars, Petra suddenly spiraled at least 157 million dinars into the red. *Id*. ¶ 52. Its United States subsidiary, PIBC, suffered a similar fate. *Id.* ¶ 55. Then, according to Chalabi, Nabulsi parlayed the cooked books into an Arthur Andersen audit report confirming massive shareholder debt, *id.* ¶ 59, which he later used as fodder for final liquidation of Petra Bank, *id.* ¶ 60.

Less than one year after the takeover, Jordan issued a liquidation decree circumventing all ordinary Jordanian bankruptcy law, giving Nabulsi "unlimited power and discretion" as liquidator and completely wiping out Petra's shareholders by dissolving the bank under the purported condition of massive debt. Compl. ¶¶ 59, 62-64 (citing ESC Resolution No. 4/90 (July 15, 1990), *as amended by* ESC Resolution No. 7/90 (Sept. 20 1990)). That decree set an order of priority and provided that "the balance of the assets shall be divided pari passu among the creditors." ESC Resolution No. 4/90 ¶ 17(a)(5). Although some debts were to be paid, the decree made no provision of any kind for equity holders such as Chalabi. At the same time, Chalabi was tried in absentia for embezzlement. Following what he describes as a "sham trial" premised on evidence obtained through torture, intimidation, and fraud, Chalabi was convicted in April 1992. Compl. ¶¶ 68-75.

The complaint alleges that Nabulsi has since used his power as liquidator to shuttle Petra's assets to himself, his friends, and the politically connected. Compl. ¶¶ 65-66. Other than the continued mismanagement of the assets that Jordan seized and allotted to creditors in 1990, however, the complaint alleges little else since Chalabi's conviction. It does charge that Jordan sought Chalabi's extradition in 2004 and that it smeared him as an "embezzler" and "thug," *id.* ¶

78, but it brings no claim for defamation amongst its other common-law tort and civil RICO claims.

Satisfied that Chalabi had alleged—if not shown—facts sufficient to overcome Jordan's sovereign immunity under the "commercial activity" exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2), the district court nonetheless held that the statutes of limitation applicable to Chalabi's claims provided a straightforward, "non-merits ground" for resolving the case. *Chalabi v. Hashemite Kingdom of Jordan*, 503 F. Supp. 2d 267, 273 (D.D.C. 2007). According to the district court, Chalabi missed the deadline by more than a decade: the three-year period for common law torts and the four-year period for civil RICO began running in 1989 when, according to the complaint itself, Chalabi became aware of the seizure, the planned kidnapping, and Nabulsi's designs on his destruction. *Id.* at 273-74. The district court thus dismissed Chalabi's claims as untimely, obviating any need for jurisdictional discovery.

On appeal, Chalabi does not dispute that the limitations clock began running on his claims in 1989. Instead, he argues that those claims are saved from staleness by the continuing tort doctrine.

**II.**

We must first satisfy ourselves whether, in deferring final resolution of Jordan's claim of foreign sovereign immunity, the district court properly moved the timeliness issue to the head of the line. Jordan's immunity claim implicates our jurisdiction, *see* 28 U.S.C. § 1604 ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in . . . this chapter."), and under the rule in *Steel Co. v. Citizens for a*

*Better Environment*, 523 U.S. 83, 94-95 (1998), we may not assume jurisdiction even to follow a better-marked path to disposition. But this rule is not absolute. As the district court explained, "'a federal court has leeway to choose among *threshold* grounds for denying audience to a case on the merits.'" *Chalabi*, 503 F. Supp. 2d at 273 (emphasis added) (quoting *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 127 S. Ct. 1184, 1191 (2007)). The district court decided that because timeliness in this case represented a threshold ground for denying audience rather than a judgment on the merits, it could be reached before a final decision on the jurisdictional question of foreign immunity. *Chalabi*, 503 F. Supp. 2d at 273.

As timeliness has both threshold and merits characteristics, we would face a difficult question if *Steel Co.* actually applied to this case. But it doesn't. *Steel Co.* requires that we prioritize the jurisdictional issue only when the existence of *Article III* jurisdiction is in doubt; that decision "explicitly recognized the propriety of addressing the merits where doing so made it possible to avoid a doubtful issue of *statutory* jurisdiction." *Kramer v. Gates*, 481 F.3d 788, 791 (D.C. Cir. 2007) (citing *Steel Co.*, 523 U.S. at 96-97 & n.2). There is no Article III question here: Jordan's claim of immunity concerns only the limits of our statutory jurisdiction under the Foreign Sovereign Immunities Act. Thus, even if a decision on timeliness qualifies as a "'judgment on the merits,'" *Sinochem*, 127 S. Ct. at 1192 (quoting *Intec USA*, *LLC v. Engle*, 467 F.3d 1038, 1041 (7th Cir. 2006)), *Steel Co.*'s bar on hypothetical jurisdiction poses no obstacle to resolving it first.

This outcome conforms to both common sense and congressional intent. It would hardly respect Jordan's sovereignty to require it to pay for jurisdictional discovery on

claims plainly barred. In one foreign immunity case before *Steel Co.*, we exercised pendent appellate jurisdiction and resolved a statute of limitations question precisely in order to avoid a difficult question of statutory jurisdiction. *See Rendall-Speranza v. Nassim*, 107 F.3d 913, 917 (D.C. Cir. 1997). Nothing in the Supreme Court's recent cases requires us to depart from that sensible course.

## III.

Turning to the timeliness issue, which we review *de novo*, *see Jung v. Mundy, Holt & Mance, P.C.*, 372 F.3d 429, 432 (D.C. Cir. 2004), we have no trouble agreeing with the district court that Chalabi's claims are time-barred.

Chalabi admits that the statute of limitations for his common-law tort claims is three years, and he does not dispute that his claim accrued when he learned of the plot against him in 1989. Nonetheless, he maintains that he properly pled a "continuing tort." In the District of Columbia, this doctrine requires that Chalabi allege "(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act within the limitation period." *Beard v. Edmondson & Gallagher*, 790 A.2d 541, 547-48 (D.C. 2002) (internal quotation marks and ellipsis omitted). And even on the continuing tort theory, Chalabi recognizes that, because he was aware of his injury as of 1989, his recovery is limited to injuries sustained within the limitations period that immediately preceded the filing of his complaint. Appellants' Reply Br. 2 (citing *Beard*, 790 A.2d at 547-48). Thus, to have any prospect of even limited recovery, Chalabi must at a minimum show that he was injured within that time frame.

Chalabi's own complaint, and the liquidation decree that it quotes, preclude such a showing. *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) ("In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein . . . ." (internal quotation marks omitted)). Chalabi's claim of continuing injury relates to the ongoing dispersal of Petra's assets "at a fraction of their actual worth, to cronies." Appellants' Reply Br. 2; *see also* Compl. ¶ 66. Although these allegedly fraudulent sales might harm Petra's creditors, who were allocated "the balance of the assets" in the 1990 liquidation decree, *see* ESC Resolution No. 4/90 ¶ 17(a)(5), they do not harm Chalabi, who lost whatever interest he had in the bank on liquidation. His complaint itself states that the bank was seized and liquidated by an extraordinary decree that gave Nabulsi "unlimited power and discretion to carry out the liquidation and to do so without regard to any law." Compl. ¶ 63. The decree stated that "[a]ll Petra Bank assets and funds shall be attached by the liquidator," ESC Resolution No. 4/90 ¶ 6(a), and made no provision for equity holders like Chalabi in distributing the balance of Petra's assets. *Id.* ¶ 17(a)(5). It thereby extinguished Chalabi's interest as a shareholder as of the date of the decree. Chalabi's position is akin to that of a car-theft victim who alleges that his vehicle was stolen a decade ago and now complains that the thief is leasing it at below-market rates. Any current mismanagement is being visited upon someone else's asset.

To be sure, Chalabi alleges that he "*is* a shareholder" of Petra Bank. Compl. ¶ 14 (emphasis added). But given the contradictory elements of his own complaint recited above, that allegation is without consequence. *See Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) ("Nor must we accept as true the complaint's factual allegations insofar as they

contradict exhibits to the complaint or matters subject to judicial notice."). What Chalabi once held was a partial ownership stake in Petra; the stock certificates he may still hold are but meaningless paper. As with the tardy car-theft victim described above, the fact that a shareholder still has paper title to the long-stolen property does not make the claim of theft any less stale, nor does it create injury from the property's misuse when the plaintiff's actual interest is long gone.

The absence of recent injury likewise bars Chalabi's RICO claim. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997) (dismissing RICO claim where plaintiffs had not "shown how any new act could have caused them harm over and above the harm that the earlier acts caused," even though they alleged predicate acts that occurred within the limitations period). And on neither count do we see merit in Chalabi's contention that he is injured by Jordan's "ongoing failure to return" the wrongfully seized property, Appellant's Br. 21. "[T]he mere failure to right a wrong and make plaintiff whole cannot be a continuing wrong which tolls the statute of limitations, for that is the purpose of any lawsuit and the exception would obliterate the rule." *Fitzgerald v. Seamans*, 553 F.2d 220, 230 (D.C. Cir. 1977).

Although Chalabi's complaint does allege recent smears and defamations, Compl. ¶¶ 76-78, it presses them not as new injuries, but as "wire communications" for purposes of the RICO claim. *Id.* Nowhere does Chalabi claim that these actions alone would rehabilitate the prior claims as continuing torts. Nor could he. These acts would be discrete wrongs, not part of "a continuous and repetitious wrong . . . with damages flowing from the act as a whole," as required by the continuing tort doctrine. *Beard*, 790 A.2d at 548 (internal quotation marks omitted).

As a final effort to claim recent injury, Chalabi argues that this is in part a derivative suit and that Jordan's continuing mismanagement is injuring the bank. Oral Arg. at 6:17. We doubt that the holder of long-valueless stock certificates can properly bring such a claim, but we decline to consider this argument in any event because Chalabi failed to brief any "contentions," "reasons" or "authorities" to support it. Fed. R. App. P. 28(a)(9)(A); *see also Duncan's Point Lot Owners Ass'n v. FERC*, 522 F.3d 371, 377 (D.C. Cir. 2008) ("[W]e will not address an asserted but unanalyzed argument because appellate courts do not sit as self-directed boards of legal inquiry and research . . . ." (internal quotation marks omitted)).

## IV.

The district court found the easiest path to resolving this case and was right to follow it, saving the plaintiff and the foreign sovereign the unnecessary expense of jurisdictional discovery. We affirm.

*So ordered.*