# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 20, 2009        Decided June 9, 2009

No. 08-7074

RALPH NADER, ET AL.,
APPELLANTS

v.

DEMOCRATIC NATIONAL COMMITTEE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-02136)

*Oliver B. Hall* argued the cause and filed the briefs for appellants.

*Joseph E. Sandler* argued the cause for appellees. With him on the brief were *Douglas K. Spaulding*, *Lasagne A. Wilhite*, *Kim M. Watterson*, *Marc E. Elias*, *John Hardin Young*, *Lawrence Noble*, *Laurence E. Gold*, *Lyn Utrecht*, and *Michael B. Trister*.

Before: SENTELLE, *Chief Judge*, and TATEL and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Believing himself the victim of a concerted effort to thwart his 2004 presidential bid, Ralph Nader sued an array of influential Democrats in late 2007 for malicious prosecution and abuse of process. His complaint alleges a far-reaching civil conspiracy whose object was to deplete his resources by forcing him to defend meritless ballot eligibility challenges in nearly twenty states. The district court dismissed the complaint, concluding that Nader's suit, if successful, would punish the Democrats for activity protected by the First Amendment. Nader appeals, arguing that the district court misapplied the applicable First Amendment test. Because the district court's approach and the merits of Nader's claims present state law issues of first impression, we think it best to resolve this case on simpler and more certain grounds. Both here and in the district court the parties fully briefed the question whether Nader's suit exceeded the applicable statute of limitations. Agreeing with defendants that the complaint itself demonstrates its untimeliness, we affirm on this ground alone.

**I.**

Because the district court granted defendants' motion to dismiss, Nader's allegations "must be taken as true." *Chalabi v. Hashemite Kingdom of Jordan*, 543 F.3d 725, 726 (D.C. Cir. 2008). So read—and citing various newspaper articles to bolster its claims—the complaint relates the following events.

Blaming Nader for their defeat in 2000, the Democrats were eager to find a way to prevent him from siphoning off their votes in the next election. Am. Compl. ¶ 1. Thus, "[d]efendants and their co-conspirators decided to try to prevent Mr. Nader from running for president if he announced his candidacy in 2004." *Id.* ¶ 45. At a not-so-secret meeting at the time of the 2004 Democratic National Convention in Boston, the alleged conspirators fleshed out a plan to "launch

a nationwide legal assault on Mr. Nader's campaign, which would drain the campaign of money, time and other resources, in a deliberate attempt to use the sheer burden of litigation itself as a means to prevent Mr. Nader from running for public office." *Id.* ¶ 45; *see also id.* ¶ 48 (quoting, without attribution, account of Four Seasons meeting in Janice D'Arcy, *Anti-Nader Forces Coordinate Strategy*, HARTFORD COURANT, July 27, 2004, at A1). According to Nader, the Democratic National Committee organized and paid for the meeting, with key attendees including such influential Democratic Party strategists as Toby Moffett, Elizabeth Holtzman, Robert Brandon, and Stanley Greenberg. *Id.* ¶ 46. Their plan entailed using three soft-money organizations— The Ballot Project, The National Progress Fund, and Uniting People for Victory—that would begin raising funds in earnest at the convention. *Id.* ¶¶ 50–51. Moffett, President of The Ballot Project, became the point man for the anti-Nader legal effort. *See id.* ¶¶ 46–52, 60–63. He told the press at the convention: "'This guy [Nader] is still a huge threat' . . . . 'We're just not going to make the same mistake we made in 2000.'" *Id.* ¶ 51 (quoting, without attribution, David Postman, *Nader Foes Seek Funding from Democratic Donors*, SEATTLE TIMES, July 28, 2004 at A1).

Nader alleges that in order to avoid the 2000 "mistake," Moffett began coordinating an effort to challenge Nader's ballot access "not only in . . . 'battleground' states but in as many other states as possible, in order 'to drain him of resources and force him to spend his time and money.'" *Id.* ¶ 47 (quoting, without attribution, Katharine Q. Seelye, *Convictions Intact, Nader Soldiers On*, N.Y. TIMES, Aug. 2, 2004, at A14 (internal quotation marks omitted)). This strategy entailed wide-ranging coordination with a diverse array of alleged co-conspirators. Moffett enlisted local Democratic parties to launch challenges to Nader's ballot

access in their respective states. *Id.* ¶ 52 (quoting Steve Terrell, *Fears of Nader Keep Dems on Offensive*, SANTA FE NEW MEXICAN, July 29, 2004, at A4); *see also id.* ¶¶ 54, 57. DNC officials filed several ballot access complaints in their own names. *Id.* ¶ 56. Labor unions and their members participated in acts of sabotage or harassment, endeavoring to derail Nader's efforts at mustering sufficient valid signatures for ballot access. *See, e.g.*, *id.* ¶ 69. While litigating a ballot challenge in Maine, Nader uncovered that the plaintiff was working in close coordination with the DNC, which was in fact paying for her lawyers. *Id.* ¶ 118. "Moffett told the *New York Times*, 'We're doing everything we can to facilitate lawyers in over 20 states.'" *Id.* ¶ 60 (quoting Katharine Q. Seelye, *Democrats' Legal Challenges Impede Nader Campaign*, N.Y. TIMES, Aug. 19, 2004, at A24). According to Nader, the effort eventually enlisted over 50 law firms performing millions of dollars of legal work. *Id.* ¶ 61. Pennsylvania represented an especially contentious forum, with hundreds of attorney hours and innumerable volunteers dedicated to scouring Nader's petitions for excludable signatures. *See id.* ¶¶ 179–90. In addition to the ballot access challenges ultimately brought in eighteen different states, the alleged co-conspirators filed five complaints with the Federal Elections Commission. *Id.* ¶¶ 126, 135, 227.

Moreover, Nader alleges, the Democrats' own words demonstrate that they brought these challenges without regard for their merit and with the ulterior purpose of bleeding his campaign dry. Nader quotes Moffett telling the *Washington Post* that "[w]e wanted to neutralize his campaign by forcing him to spend money and resources defending these things, but much to our astonishment, we've actually been more successful than we thought we'd be in stopping him from getting on at all." *Id.* ¶ 62 (quoting Jonathan Finer & Brian Faler, *Nader Unsure of Ballot Spot in Many States*, WASH.

POST, Aug. 24, 2004, at A9). Acknowledging the same purpose to the *New York Times*, Moffett said that they had sued Nader in swing states and safe states alike "'to drain him of resources and force him to spend his time and money.'" *Id.* ¶ 47 (quoting Seelye, *Convictions Intact, Nader Soldiers On*, *supra*, at A14). Nader alleges that DNC Chairman Terry McAuliffe promised to support him in some states if he would voluntarily avoid the battlegrounds, and that the Democrats' first legal complaint came on the very day Nader rejected this offer. *Id.* ¶ 3. Thus, Nader claims, the Democrats' "admitted purpose for bringing these lawsuits . . . was not to vindicate valid legal claims, but rather to bankrupt Nader-Camejo's campaign by forcing the candidates to spend their limited resources of time, talent and money on the defense of unfounded lawsuits." *Id.* ¶ 4. He believes that the Democrats' record bears him out: although winning a handful of their challenges, they "eventually lost the vast majority of lawsuits they filed." *Id.* ¶ 62.

President Bush's reelection quieted the conflict. All state ballot challenges had been resolved in the weeks prior to the election, and though the Democrats still had a handful of FEC complaints pending, each was dismissed in due course without further proceedings. In early 2005, however, the law firm that prosecuted the successful ballot access challenge in Pennsylvania, Reed Smith LLP, won an award of costs that it eventually pursued by writ of attachment in the Superior Court of the District of Columbia in the summer of 2007. *Id.* ¶¶ 194, 201–03. Nader opposed the attachment, claiming to have recently discovered a fraud in the underlying suit in the form of undisclosed ties between Reed Smith and justices of the Pennsylvania Supreme Court. *See id.* ¶¶ 194–203. That dispute remains pending in Superior Court, *see id.* ¶ 203, though the Commonwealth Court of Pennsylvania has already refused to reopen its award of costs, *see In re Nomination*

*Paper of Ralph Nader*, No. 568 M.D. 2004, slip op. at 7–9 (Pa. Commw. Ct. Dec. 4, 2008).

This brings us to the case before us, which followed closely on the heels of the Reed Smith attachment. Nader first filed his complaint in Superior Court on October 30, 2007, naming as defendants the Democratic National Committee, Kerry-Edwards 2004, The Ballot Project, America Coming Together, the Service Employees International Union, John Kerry, Jack Corrigan, Toby Moffett, Elizabeth Holtzman, Robert Brandon, Mark Brewer, and Reed Smith LLP. He alleged malicious prosecution, abuse of process, civil conspiracy, and federal civil rights violations. Defendants removed the case to federal court where, for procedural reasons having nothing to do with the issues before us, Nader then dropped his federal claims. This left only the state law claims, which defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Among other things, the Democrats argued that Nader's complaint was barred by the statute of limitations, insufficient to state a claim, and precluded by the First Amendment.

Accepting defendants' First Amendment theory that the complaint was barred by the so-called *Noerr-Pennington* doctrine, the district court granted the motion to dismiss. *See generally Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 132 n.6 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965). *Noerr* and *Pennington* are antitrust cases, but they stand for the proposition that when a person petitions the government for redress, the First Amendment prohibits any sanction on that action—for instance, a Sherman Act penalty for anti-competitive behavior—so long as the petition was in good faith. *See, e.g.*, *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 667 (D.C. Cir. 2005). For this purpose, the

Supreme Court has treated lawsuits as petitions, *see, e.g.*, *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S 731, 741 (1983) (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)).  And discussing *Noerr-Pennington*, we have said that "it is hard to see any reason why, as an abstract matter, the common law torts of malicious prosecution and abuse of process might not in some of their applications be found to violate the First Amendment," *Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C. Cir. 1995).  The district court thus thought that before Nader could bring such claims, he had to show that the Democrats' ballot challenges fell within the *Noerr-Pennington* bar's "sham exception," i.e., that their lawsuits were "(1) . . . objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits and (2) . . . brought with the specific intent to further wrongful conduct through the use of governmental process—as opposed to the outcome of that process." *Nader v. Democratic Nat'l Comm.*, 555 F. Supp. 2d 137, 157 (D.D.C. 2008) (citing *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60–61 (1993)) (internal quotation marks and brackets omitted).  Assuming for the sake of argument that the Democrats' lawsuits were in fact objectively baseless, the district court found that Nader had at least failed to allege facts sufficient to satisfy the sham test's second element—that is, inappropriate subjective intent. *Nader*, 555 F. Supp. 2d at 158–161.  It thus dismissed the complaint under *Noerr-Pennington* without reaching the Democrats' statute of limitations defense. *Id.* at 145.

Nader appeals, arguing that even if *Noerr-Pennington* applies, his allegations—fully credited as they must be on a motion to dismiss—easily satisfy the sham test.  On the merits, the Democrats defend the district court's decision and then argue that, even if Nader can overcome *Noerr-Pennington*, he failed to state claims for abuse of process and

malicious prosecution. They also renew their claim that Nader's complaint came too late. Because the district court decided these issues on a motion to dismiss, our review is *de novo*. *See Chalabi*, 543 F.3d at 729 (reviewing timeliness *de novo*); *Kaemmerling v. Lappin*, 553 F.3d 669, 676 (D.C. Cir. 2008) (reviewing decision on motion to dismiss *de novo*).

## II.

We begin by briefly addressing the elements of the torts at issue. Under District of Columbia law, "[c]ivil conspiracy is not an independent tort but only a means for establishing vicarious liability for an underlying tort." *Hill v. Medlantic Health Care Group*, 933 A.2d 314, 344 (D.C. 2007) (internal quotation marks omitted). A claim for civil conspiracy thus fails unless the elements of the underlying tort are satisfied. *See Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000) ("[C]ivil conspiracy depends on performance of some underlying tortious act." (internal quotation marks omitted)). Indeed, because its only purpose is to spread liability for a successful tort claim to all agreeing parties regardless of whether they actually committed the tortious act, a civil conspiracy claim incorporates not only every substantive element of the underlying tort, but also its statute of limitations. *See, e.g.*, *Diamond v. Davis*, 680 A.2d 364, 366 n.4 (D.C. 1996) (citing with approval *Thomas v. News World Commc'ns*, 681 F. Supp. 55, 73 (D.D.C. 1988)).

Of the substantive torts Nader alleges, malicious prosecution is the more straightforward. In the District of Columbia, malicious prosecution requires: "(1) [that] the underlying suit terminated in plaintiff's favor; (2) malice on the part of the defendant; (3) lack of probable cause for the underlying suit; and (4) special injury occasioned by the plaintiff as the result of the original action." *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980). In other words, the

victor may sue the vanquished for a baseless suit if it was brought with malicious disregard for its validity and caused injury over and above the ordinary costs of litigation.  And although "injuries to reputation, emotional distress, loss of income, and substantial expense in defending have all been held to fall outside the scope of the definition of special injury," *Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279, 1282 (D.C. 2002) (internal quotation marks omitted), we long ago held that, as a matter of District of Columbia law, repetitious malicious actions may satisfy this element, *see Soffos v. Eaton*, 152 F.2d 682, 683 (D.C. Cir. 1946) ("[O]ne who twice sues another maliciously and without probable cause is responsible to him in damages.").

Abuse of process presents more complicated issues. Although we observed in *Whelan* that, under its most expansive interpretation, this tort could be used even against someone who sues successfully while harboring an improper motive, *see* 48 F.3d at 1257, the District of Columbia Court of Appeals has given the tort a narrower construction while leaving its exact elements far from clear.  *See, e.g.*, *Morowitz*, 423 A.2d at 198 (holding that while "ulterior motive" is insufficient, the "critical concern . . . is whether process was used to accomplish an end unintended by law, and whether the suit was instituted to achieve a result not regularly or legally obtainable.").  According to the District of Columbia Court of Appeals, abuse of process "lies where the legal system has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do." *Bown v. Hamilton*, 601 A.2d 1074, 1079 (D.C. 1992) (internal quotation marks omitted).  We know at least that suits intended primarily to achieve their lawful purpose need not be brought with a pure heart.  *See, e.g.*, *Scott v. District of*

*Columbia*, 101 F.3d 748, 755–56 (D.C. Cir. 1996) (holding that attempt to secure conviction was not abuse of process even where defendant alleged police officers had "ulterior aim of covering up their use of excessive force"). Still, the District of Columbia Court of Appeals has yet to provide precise guidance on the question of how "collateral" the "thing [that] could not legally and regularly be required," *Bown*, 601 A.2d at 1079, must be to support an abuse of process claim, which represents the essential question in determining the boundary between everyday litigation and tortious abuse of court procedures.

Nader's theory simplifies the issue, however. Because the Democrats were, after all, bringing ballot challenges to achieve their goal of keeping Nader off the ballot—a perfectly natural means to what is a perfectly lawful end in and of itself—the only way they could even theoretically have abused the legal process was by filing such claims knowing that they were false. Nader's theory of either tort thus requires him to prove a pattern of filings that were objectively baseless and intentionally so.

This discussion should make clear that Nader's civil conspiracy theory, which aggregates the Democrats' many challenges into a single pattern of baseless litigation, is essential to the validity of his claims. Nader's theory of special injury for malicious prosecution, as well as his theory of the "collateral" end for abuse of process, both turn on his ability to demonstrate that the Democrats employed a pattern of baseless litigation to deprive him so dramatically of resources as to leave him unable to meaningfully campaign for the presidency. Reviewing the allegations of a broad Democratic strategy recited in the complaint, *see, e.g.*, Am. Compl. ¶¶ 45–66, and even in the headers of his briefs to this court, *see, e.g.*, Appellants' Opening Br. 11 ("Conspirators

Filed Twenty-Nine Complaints . . . in an Effort to Use a Pattern of Baseless and Repetitive Claims as a Means to Bar the Candidates from Running For Public Office During the 2004 General Election."), we think it plain that it is this aggregated, conspiratorial theory of misuse of the judicial process that Nader has actually brought.  Indeed, although the complaint recites some facts from each individual forum where Nader's access was challenged, *see* Am. Compl. ¶¶ 72–227, it contains no facts tending to show that any individual claim was objectively baseless other than its relation to the scheme and the large number of failed claims overall.

On the merits, this aggregated theory presents interesting legal issues of first impression.  First is the applicability of *Noerr-Pennington*.  If Nader in fact concedes that his theory requires him to prove a pattern of deliberately false filings, no *Noerr-Pennington* problem could arise because "[h]owever broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods." *Whelan*, 48 F.3d at 1255.  But if Nader argues that he can prevail on abuse of process without such proof, *see* Oral Arg. Tr. 34–37, we would then have to decide—or perhaps certify to the District of Columbia Court of Appeals—the question of the exact scope of abuse of process in relation to the *Noerr-Pennington* doctrine.  *See Whelan*, 48 F.3d at 1257 (raising precisely this concern).  Moreover, even were Nader to concede that he must prove a strategy of repeatedly filing deliberately false claims, a difficult question would remain as to whether his complaint can actually allege as much where, as here, it acknowledges that the Democrats were batting between .172 and .263 depending on whether one counts filings or forums—far above the perfect failure rate we might expect for a strategy without any basis at all.  In other words, we would need to decide whether Nader must prove that the Democrats' overall strategy was itself objectively baseless or

whether it would be sufficient for Nader to show only that the Democrats' strategy resulted in more than one baseless suit. Then, assuming Nader's claim could survive despite the Democrats' handful of wins, we would face the choice of law problem in marking the boundary between a Democratic loss and a baseless lawsuit. If the question is the baselessness of the strategy writ large, then perhaps District of Columbia law would suffice. But if each suit requires separate consideration, we would face nineteen separate legal standards, each having at least three inquiries: (1) What makes a valid ballot challenge in State X? (2) What is State X's law of probable cause for purposes of malicious prosecution? and (3) Does State X have a special standard for, say, sending a letter to an election commission or for election law issues in general? Almost all these legal issues are questions of state law on which we lack instructive precedents. And this list is hardly exhaustive.

Such problems convince us to rely on the statute of limitations as the better-marked path to disposition. Although we normally prefer to address the district court's rationale, "we may affirm on any ground properly raised," *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009) (internal quotation marks omitted), and choosing such an alternative makes particular sense where, as here, it means avoiding questions of state law on which we have little guidance from the state courts.

## III.

With respect to the statute of limitations, we begin from common ground. The D.C. Code sets the statute of limitations for malicious prosecution at one year. *See* D.C. CODE § 12-301(4). The D.C. Code contains no specific provision for abuse of process, however, and the District of Columbia Court of Appeals has never decided whether its

similarity to malicious prosecution brings it within this one-year period or whether it instead falls within D.C. Code section 12-301(8)'s three-year catch-all. *See* D.C. CODE § 12-301(8). Because the court appears to interpret limitations provisions in favor of claimants, however, *see, e.g.*, *Saunders v. Nemati*, 580 A.2d 660, 663–64 (D.C. 1990) (holding that tort based on verbal abuse not covered by one year statute of limitations for assault), we think it safest to assume that the limitations period for abuse of process is three years. For malicious prosecution, the limitations period would ordinarily run from the date on which the underlying action terminated in the defendant's favor; for abuse of process, it would ordinarily run from the date on which abusive process last issued. We say ordinarily because it would normally be obvious to a victim of a malicious or abusive suit at the time of suit that every element of either tort claim was met. *Cf.* D.C. CODE § 12-301 ("[T]he period specified below [runs] from the time the right to maintain the action accrues."). Nader filed his complaint on October 30, 2007. Thus, even assuming Nader can properly allege abuse of process, and that the statute of limitations for abuse of process is in fact three years, Nader's timely filing window cannot stretch back any earlier than October 30, 2004. And significantly for our purposes, Nader nowhere disputes that every one of the Democrats' challenges terminated more than one year before he filed his complaint and that no process issued against him in any of those proceedings within three years of this suit.

Nader nonetheless insists that the statute of limitations presents no bar. His primary argument is that because both the DNC and the Kerry Campaign denied any involvement in the state ballot challenges, he may charge the Democrats in general with fraudulently concealing the coordinated and conspiratorial nature of their conduct, thereby depriving him of the notice necessary to start the running of the limitations

period. *See, e.g.*, *Richards v. Mileski*, 662 F.2d 65, 72 (D.C. Cir. 1981) (tolling limitations period for plaintiff who "knew that the charges against him were based on misrepresentation" because he lacked constructive knowledge that "defendants deliberately conspired" against him). In Nader's view, the Democrats' fraudulent denials "were intended to conceal, and did in fact conceal, the Defendants' participation in the unlawful conspiracy alleged in the Amended Complaint, and even the existence of the conspiracy itself, until after the conclusion of the 2004 General Election." Appellants' Reply Br. 26–27. To be sure, the Democratic Party and the Kerry Campaign may well have tried to conceal coordinating with The Ballot Project's effort—certain kinds of coordination have serious implications for campaign finance laws. But at least under District of Columbia law, the question isn't whether tortfeasors have tried to fraudulently conceal their conduct, it's whether they succeeded. *See, e.g.*, *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1494 (D.C. Cir. 1989) ("Clearly, the doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim." (internal quotation marks omitted)). And although we have said that "a defendant who has engaged in fraudulent concealment, in order to make out a defense based on the plaintiff's lack of due diligence, must show something closer to actual notice than the merest inquiry notice," *id.* at 1491, the District of Columbia Court of Appeals has since expressly disagreed, holding that "the standard is in fact the same in all cases to which the discovery rule applies, regardless of the presence or absence of fraud," *Diamond*, 680 A.2d at 381; *see also id.* at 376–79. That standard is knowledge of "(1) an injury; (2) its cause in fact; and (3) some evidence of wrongdoing," *id.* at 379, and it includes not only what Nader knew, but what he could by reasonable diligence have known, *see id.* at 381.

Under that standard, Nader's argument, set forth in his brief, that the Democrats "did in fact conceal . . . the existence of the conspiracy" is belied by the facts he alleges in his complaint. Because every victim of a baseless suit immediately knows their injury and its cause in fact, the question is only whether the allegations in the complaint establish that Nader knew, or should have known, of "some evidence" of a conspiracy to abusively deploy a pattern of baseless suits against him. The answer to that question is yes.

Nader's complaint supports its allegations with a series of newspaper articles that on their face reveal the existence of the very conspiracy of which Nader now complains. For example, the complaint quotes Moffett's statements about The Ballot Project coordinating attorneys in twenty states and being astonished at their own legal success. The conspiratorial planning session immediately before the convention was reported in an article Nader cites, and the complaint references the fact that the Democrats' very first challenge came on the day that Nader declined an offer from DNC Chairman Terry McAuliffe to support Nader in certain states if he would give up his campaign in others. The complaint even quotes from a deposition in which the plaintiff in the Maine litigation admits that the Democratic Party was paying for her lawyers, and it notes that the Michigan case was filed in the name of the Vice Chair of the DNC himself, Am. Compl. ¶ 123. Although the complaint omits these details, the *Washington Post* article that Nader himself cites reported on August 24, 2004 that Nader was being "[d]ogged by an unprecedented public relations and legal campaign against him *by the Democratic Party and like-minded groups*," and that same story quotes a Nader spokesman complaining that "[i]n 2000, we didn't have to waste so much time fending off dirty tricks." Finer & Faler, *supra*, at A1 (emphasis added); *cf. Kaempe v. Myers*, 367 F.3d 963–65

(D.C. Cir. 2004) (considering content of document on motion to dismiss where complaint relied on that document's terms). Together, these facts demonstrate Nader's actual knowledge of his cause of action—particularly the revelation in Maine and the statement by his spokesman. But even if not, it would be strange if the *Washington Post* could discover facts about Nader's life that he couldn't reasonably discover himself, especially because, unlike the *Post* writers, Nader could have read about it in the paper.

We find a comparison to the facts of *Richards v. Mileski* instructive. *See* 662 F.2d at 67–69. In 1955, the United States Information Agency fired Richards based on an informant's false allegation that Richards engaged in homosexual behavior. Though Richards obviously knew then that the allegations were false, he failed to sue until 23 years later when he first discovered that the informant's report had not actually misled the government, but had instead been concocted by the government investigators themselves with the aid of an unreliable informant. *See id.* at 67–68. We concluded that Richards's claims were nonetheless timely, calling it "no mere 'detail' in 1955 that the false charges against Richards had been fabricated as part of a deliberate conspiracy against him, or that his own superiors rather than an unknown informant were the source of his misery." *Id.* at 69. Indeed, we emphasized that Richards's new claims for fraud, defamation, intentional infliction of emotional distress, and violation of his constitutional rights were distinct from the claims available before the revelation of government malfeasance: "[p]ossible claims of wrongful discharge or coerced resignation, which are not raised in this suit, are entirely separate from the causes of action for which Richards now seeks his day in court." *Id.* at 69; *see also id.* at 67 n.1 (listing claims).

Nader's case, involving only newly discovered participants in already known conduct, is worlds apart. Indeed, even had the complaint left any doubt about Nader's constructive knowledge of the DNC's involvement in 2004, a later revelation of the national party's role would change nothing about the claim Nader could have brought in August 2004 against Moffett and his alleged co-conspirators—other than adding a new target. Unlike the facts in *Richards*, the involvement of the DNC here does not alter the fundamental nature of the wrong at issue, and so the addition of this co-conspirator cannot resuscitate Nader's claim against the entire conspiracy. *See Fitzgerald v. Seamans*, 553 F.2d 220, 229 (D.C. Cir. 1977) (affirming summary judgment on claims against conspirators known at time of injury, even while tolling period for a conspirator who successfully concealed his involvement).

But perhaps Nader's argument is more limited: that even if his claim is untimely as against the conspiracy in general, he may still sue those particular defendants whose involvement was effectively concealed until later. *See* Appellant's Reply Br. 26–27 (apparently distinguishing between knowledge of the conspiracy and knowledge of defendants' involvement). We endorsed such a principle in *Fitzgerald*, 553 F.2d at 229, and the District of Columbia Court of Appeals has since agreed, *see Diamond*, 680 A.2d at 380. The viability of such a theory turns on the known relationships among the co-conspirators, however, and although the District of Columbia Court of Appeals explained in *Diamond* that this will often be a question of fact, it held there that "the relationship of the defendants, together with other facts, may establish as a matter of law that a reasonable plaintiff with knowledge of the misconduct of one [co-conspirator] would have conducted an investigation as to the other." *Id.* Here, the complaint identifies only the DNC and

the Kerry Campaign as having attempted to conceal their roles. *See* Am. Compl. ¶¶ 64–65; *see also id.* ¶ 204 (alleging that Reed Smith concealed that it had been retained by the DNC). Elsewhere, however, the complaint establishes that the DNC's role was hardly a secret. Nader surely had inquiry notice of a claim against the DNC when he discovered it was paying the lawyers in the Maine dispute. And given the relationship between the Kerry Campaign and the DNC at the time of the 2004 election, we cannot see how the campaign would have fallen outside the zone of reasonable suspicion after that.

As a fallback, Nader argues that Reed Smith's recent attachment against him in Superior Court makes his entire claim timely as a continuing tort. In the District of Columbia, a continuing tort requires "(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act within the limitation period." *Beard v. Edmondson & Gallagher*, 790 A.2d 541, 547–48 (D.C. 2002) (internal quotation marks and ellipsis omitted). Nader's theory fails the test's second element because the damages flowing from the attachment are self-evidently separate from those related to the ballot challenges. His alleged injury from the pattern of baseless ballot challenges was having been deprived of resources for the 2004 presidential election, and whatever damages the recent attachment may have caused, it could not possibly have contributed to harming Nader's campaign three years earlier. If this attachment was in fact abusive then Nader might have recourse through a separate suit—assuming, of course, that dispositions in the Pennsylvania courts have not yet precluded the issue. Even so, he may not use the attachment to pry open a timely-filing window now firmly closed.

## IV.

Whatever the Democrats tried to conceal, Nader's own complaint reveals his constructive knowledge of "some evidence of wrongdoing" by each current defendant more than three years before he filed his suit. Because Nader's complaint is thus untimely on its face, we affirm on this limitations ground without addressing the district court's decision or the ultimate merits of Nader's theory of the case.

*So ordered.*